1422

AMBER REFINING, INC.,
et al., Plaintiffs,

v.

The PERMIAN CORPORATION,
et al., Defendants.

No. CA4–83–443–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

March 13, 1991.

Memorandum Opinion March 29, 1991.

Cecil E. Munn, H. Carter Burdette, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex., for Amber Refining, Inc. and E–Z Serve Refining, Inc.

Glen E. Clover, Liddell, Sapp & Zivley, Houston, Tex., for Occidental Oil & Gas Co.

Marvin Collins, U.S. Atty., Mattie Peterson Compton, Asst. U.S. Atty., Fort Worth, Tex., Don W. Crockett, Phyllis Jo Gervasio, Dept. of Energy, Economic Regulatory Admin., Office of Sol., Washington, D.C., for Dept. of Energy.

MEMORANDUM OPINION
AND ORDER

McBRYDE, District Judge.

On December 20, 1990, an evidentiary hearing was held on motions[1] that have

1. Motion filed by plaintiffs January 29, 1986, entitled "Motion to Join United States Depart-

raised the issue of whether United States Department of Energy ("DOE"), a party to this action, unreasonably withheld approval of a settlement negotiated by defendant, The Permian Corporation ("Permian"), with plaintiffs, Amber Refining, Inc. ("Amber"), and E–Z Serve Refining, Inc. ("E–Z"). After having considered such motions, the pleadings of the parties, the evidence received, and statements made by counsel, at the hearing, admissions made by DOE in memoranda and motions filed by it, the joint pretrial order, and the record of the hearings held in this case on July 14, 1986, November 26, 1986, and January 12, 1989, the court has concluded, and finds, that DOE unreasonably withheld approval of the settlement.

### Background of Litigation Pertinent to Approval of Settlement Issue

This action was instituted in 1983 by Amber and E–Z against Permian for recovery of damages alleged to have been suffered by Amber and E–Z under § 210 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, Historical and Statutory Notes, which, by § 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1), was made applicable to actions involving the federal price control regulations.[2] Plaintiffs alleged that they suffered damages because of over-charges Permian made for petroleum products sold by Permian to plaintiffs.[3]

Earlier, in March 1982, Permian and DOE, acting through its Economic Regulatory Administration, had entered into a consent order for the purpose of settling and resolving civil and administrative disputes, claims and causes of action by DOE against Permian relating to Permian's compliance with federal petroleum price and allocation regulations administered and enforced by DOE and its predecessor agencies during the period August 19, 1973, through January 27, 1981.[4] Amber Ex. 7 at 1. In addition to accomplishing settlement of disputes between Permian and DOE, the consent order made provision for payment by Permian of money into an escrow account to be used for the payment of settlements negotiated by Permian with aggrieved customers, such as Amber and E–Z. *Id.* at 6–7. Section 401 of the consent order makes clear that the purpose of the payment to be made by Permian was to provide compensation for "alleged overcharges and payments assertedly made improperly in connection with" transactions of the kind of which Amber and E–Z complain. *Id.* at 6. Witness Clover, who was intimately familiar with the consent order, explained the purpose of the escrow account as follows:

> The purpose of the escrow account was to protect Permian from claims and judgments growing out of either the purchase or the sale or the handling of crude oil, and in that connection it was a somewhat unusual Permian situation because the Department of Energy always thought about somebody being overcharged, and that is why payments were made, were to cover overcharges.

Transcript of 12/20/90 hearing at 126 [hereinafter cited as Tr. 12/20/90].

Permian's financial outlay under the consent order was a $7,000,000.00 payment by Permian to the United States Treasury and a $14,500,000.00 payment, which was the escrow account payment, to be handled and used as follows:

> 403. (a) Within thirty days after the effective date of this Consent Order, Permian shall establish an interest-bearing

---

ment of Energy as a Party and for Order to Show Cause why Approval of Negotiated Settlement is Not Being Unreasonably Withheld" and motion filed by Permian on April 9, 1986, entitled "Motion of Defendant The Permian Corporation for Order Relating to Settlement."

**2.** An overview of the applicable regulatory scheme appears as an appendix to DOE's May 1986 memorandum in support of its motion for partial summary judgment.

**3.** Many of the purchases were made by Amber when its legal name was Winston Refining, Inc. Complaint at 1.

**4.** The petroleum product purchases about which plaintiffs were complaining were within the covered time period.

escrow account (Escrow Account) in the amount of fourteen and one-half million dollars ($14,500,000) in a federally-chartered national bank in the United States selected by Permian to serve as the escrow agent, the escrow agreement to be subject to approval by the DOE.

(b) The escrow agent shall be responsible for the maintenance and disbursement of the Escrow Account. From the balance of the Escrow Account there will be subtracted amounts paid by the escrow agent on behalf of Permian to third parties on account of claims arising from the Specified Transactions [5] either (i) pursuant to any final judgment in a contested action, provided Permian gives notice of the filing of such action to DOE, or (ii) pursuant to any settlement negotiated by Permian and approved by the DOE, which approval shall not be unreasonably withheld.

Amber Ex. 7 at 6–7. The (c) and (d) parts of § 403 provided that at the end of twelve months after the effective date of the consent order, which was June 1, 1982, and again at the end of twenty-four months after the effective date, a certain portion of the then unused balance of the escrow account would be remitted to the United States Treasury. *Id.* at 7–8. Then, the (e) part provided that:

(e) The balance remaining in the Escrow Account thirty-six (36) months from the effective date of this Consent Order, except as subject to a court order to the contrary, shall be remitted by the escrow agent to the United States Treasury in the manner provided in paragraph 402 above.

*Id.* at 8.

Negotiations by Permian to the end of reaching a settlement of the claims of Amber and E–Z against Permian came to fruition in late May 1985 when the parties reached a settlement agreement. The terms of the settlement are set forth in a May 29, 1985, letter from Permian's counsel to counsel for Amber and E–Z, which was accepted by the signature of plaintiffs' counsel on May 29, 1985. The letter referenced this action and provided, in pertinent part, that:

This letter agreement will evidence our settlement of the captioned case upon the terms and conditions set forth herein.

In full and final settlement of all claims on the part of Amber Refining, Inc. and E–Z Serve Refining, Inc. their parents, subsidiaries, and affiliates, and their successors and assigns (hereinafter collectively called "Amber"), whether alleged in the captioned cause or not, Amber will be paid the total sum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00). Such sum shall be payable only out of the Escrow Account administered at MBank Houston, National Association (formerly the Bank of the Southwest, National Association) a National banking association located in Houston, Texas, which Escrow Account was established pursuant to the Consent Order between Permian and the Economic Regulatory Administration of the Department of Energy ("DOE") in Case No. 650X00246. It is understood and agreed that this settlement and the payment of the settlement amount out of said Escrow Account is subject to the approval of the DOE.

Permian agrees to submit this settlement to the DOE and to make reasonable efforts to obtain the approval of the DOE. Upon request and at the direction of Permian, Amber agrees to assist Permian in submitting this settlement for DOE approval.

If DOE approval of this settlement is obtained and the settlement amount is paid out of the Escrow Account, Amber will dismiss its claims in the captioned cause with prejudice. It is further understood and agreed that Amber will provide Permian with a General Release of all claims, whether presently asserted in

---

**5.** All parties to this action seem to have conceded that the claims asserted by Amber and E–Z against Permian arose from Specified Transactions, as those words are used in 403(b). DOE has not expressed a contention on that

point, and the parties have not specified an issue of fact or law on that subject, in their agreed pretrial order, as they would have been required to do under the court's pretrial instructions if the matter was in dispute.

the captioned case or not. It is further understood and agreed that such General Release will be binding upon Plaintiffs, their parents, subsidiaries and affiliates, and their successors and assigns. The Dismissal Order shall provide that each party will pay the court costs incurred by such party and the legal expenses incurred by such party.

. . . .

In the event that DOE approval is not obtained, then it is agreed and understood that this settlement will be null and void; provided, however, that neither party will be precluded from taking further action against the DOE pursuant to Paragraph 701 of the Consent Order to obtain approval of this settlement and payment of same out of the Escrow Account. And, it is further understood and agreed that nothing contained herein, and no act performed or statement made in seeking DOE approval, shall be used by any party in any way or manner whatsoever in the captioned litigation.

Amber Ex. 11.

By a June 1985 letter from Permian, on the letterhead of Occidental Oil and Gas Company, to DOE, Permian informed DOE of the settlement, provided DOE with a copy of the May 29 settlement agreement, and requested DOE's approval of the settlement. The letter said, *inter alia,* that:

This case is clearly within the scope of the Consent Order as it is based on allegations of overcharges by Permian for crude oil sold to one of its customers during the covered period. This case is clearly one that Permian and the DOE intended that the Escrow Account be used to resolve.

Pursuant to the provisions of the subject Consent Order paragraph 403(b)(ii), Permian hereby requests DOE approval of payment to Amber of the negotiated amount of $2,250,000 so that this case may be dismissed with prejudice.

Permian Ex. 1, tab 14.

On May 29, 1985, Amber and E–Z filed an unopposed motion advising the court of the settlement agreement and the terms of the consent order (including the order's section 403(e) proviso that the balance remaining in the escrow account thirty-six months after June 1, 1985, was to be remitted to the United States Treasury "except as subject to a court order to the contrary") and asking the court to enter an order requiring Permian, and authorizing the escrow agent, to retain in the escrow account the sum of $2,250,000.00 for purposes of this litigation, pending further order of the court. An agreed order of the kind sought by the motion was signed May 29, 1985. Because of that order, $2,250,000.00 remains on deposit in the escrow account.

DOE declined to approve the settlement agreement. This led to the filing by plaintiffs in January 1986 of their motion to join DOE as a party to this action and for order to show cause relative to approval of the settlement. Plaintiffs' motion to join DOE was granted, and DOE filed responsive pleadings. It assented to being made a party, indicating that it had planned in any event to intervene. In April 1986, after DOE had questioned the standing of plaintiffs to seek a show cause order, Permian filed its motion for orders relating to the settlement, which included requests that the court find that DOE had unreasonably withheld approval of the settlement and for an order that the settlement be paid by the funds impounded by the court's May 29, 1985, order.

The parties engaged in numerous legal skirmishes in this action during the years 1986 through 1990 as a result, for the most part, of DOE's insistence that the court should not address the issue of whether DOE unreasonably withheld its approval to the settlement negotiated by Permian but, instead, should try the merits of the claims of Amber and E–Z against Permian. In the course of advocating grant of summary judgment on the merits, lead counsel for DOE explained the posture of DOE by saying that:

We want a resolution of this on the merits and that's the way we have filed our Motion for Summary Judgment. And we are confident that when the Court decides that the Motion for Summary Judgment that there be no liability on the part

of Permian to Amber and that will end the case.

Transcript of 7/14/86 hearing at 23 [hereinafter cited as Tr. 7/14/86]. *See also* Tr. 7/14/86 at 28–29 (remarks of lead counsel for DOE). Doe's goal has been to render moot the issue of whether it wrongfully refused to approve the settlement by helping Permian prevail on the merits. DOE's Opposition to the Motion of Permian for Order Related to Settlement at 1–2.

As noted above, the December 20, 1990, hearing was on the motion plaintiffs filed in January 1986 and the motion Permian filed in April 1986 for orders relating to the settlement. DOE has maintained throughout its involvement in this litigation that Amber and E–Z have no standing to question DOE's conduct in relation to the approval process or to seek disbursement of escrow account funds for use as a settlement payment. Presumably DOE concedes that Permian has standing on both of those issues. Therefore, the court does not need to resolve the controversy relative to standing of Amber and E–Z. Permian's motion puts the issues directly before the court for resolution.

Though the May 29, 1985, settlement agreement provides that it will be null and void in the event DOE approval is not obtained, it goes on to provide that neither party will be precluded from taking further action pursuant to § 701 [6] of the consent order to obtain approval of the settlement and payment out of the escrow account. Amber, E–Z and Permian each has elected not to treat the settlement as null and void but, instead, to take, by their conduct in this action, including the filing and prosecution of the motions that were heard on December 20, 1990, further action against DOE to obtain approval of the settlement and payment of the settlement amount out of the escrow account.

---

**6.** Section 701 of the consent order provides:
701. It is the understanding and express intention of Permian and DOE that this Consent Order constitutes a legally enforceable contractual undertaking that is binding on the parties and their successors and assigns. Notwithstanding any other provision herein, Permian and DOE each reserves the right to

*Explanations, Reasons, Excuses, etc., Given by DOE for its Conduct Related to its Approval Function*

■ The explanations, reasons and excuses advanced from time to time by DOE relative to its conduct in the performance, or nonperformance, of its approval function can perhaps best be characterized as a form of legal prestidigitation.

On the most basic question of whether or not DOE has, in fact, declined to approve the settlement, DOE's explanations have gone from the extreme of a claim of prompt rejection to the other extreme of a contention that DOE has yet to make a final decision. The first extreme was expressed by DOE in a memorandum it filed with the court in May 1986 in which it said:

> Then, in early June Permian submitted the purported settlement agreement to DOE for its approval. By letter dated June 7, 1985, DOE rejected the purported settlement ...

Memorandum in Support of Motion for Partial Summary Judgment by Defendant Department of Energy at 6. At the November 26, 1986, hearing, lead counsel for DOE represented to the court that "DOE promptly rejected" the settlement a week after it was submitted by Permian to DOE in June 1985. Transcript of 11/26/86 hearing at 7 [hereinafter cited as Tr. 11/26/86]. In sharp contrast, this same lead counsel represented to the court at the December 20, 1990, hearing that DOE's rejection of the settlement occurred December 16, 1985, and that before that date DOE had not made the decision to withhold approval of the settlement.

> THE COURT: ...
>
> When does the DOE take the position that is the point in time that the DOE considers it reject[ed] the settlement?
>
> ....

institute a civil action in an appropriate United States district court, if necessary, to secure enforcement of the terms of this Consent Order, including payment of interest for each day any payment required by this Consent Order is late.
Amber Ex. 7 at 13.

MR. CROCKETT: Oh, in December. There was a meeting held at the Department of Energy on December 16th, 1985 which was attended by Mr. —

THE COURT: December 16, 1985?

MR. CROCKETT: Right.

THE COURT: Is that the date that DOE rejected the settlement?

MR. CROCKETT: Yes.

. . . .

THE COURT: Had the decision been made to withhold approval before that date?

MR. CROCKETT: No, no. Mr. Lorenz—

THE COURT: It had not?

MR. CROCKETT: No.

. . . .

THE COURT: I want to be sure I understand.

You are saying that DOE had not made the decision before December 16, 1985 to withhold approval of the settlement?

MR. CROCKETT: That is correct.

Tr. 12/20/90 at 27–28. The other extreme came from the mouth of Milton Lorenz, the special counsel for DOE in whom the ultimate decision for approval, *vel non*, was vested. Tr. 12/20/90 at 49. Lorenz gave the following answer when his deposition was being taken in September 1986:

Q. Is the Permian–Amber settlement then the only settlement negotiated by a seller with an overcharge claimant payable out of an escrow fund created with that seller's money that the DOE has ultimately declined to approve?

A. *I never considered that I ultimately declined to approve.* It was the firm that chose to embark on litigation to dispute the point.

Amber Ex. 5 at 566 (emphasis added).

The panoply of excuses, reasons, etc., for not approving the settlement is equally wide-ranging, and it is replete with internal inconsistencies and contradictions.

DOE represented to the court in its very first substantive filing in this action that it had two reasons for not approving the settlement—first, because the settlement agreement was untimely, and, second, because it did not relate to matters properly compensable out of the escrow account.[7] In contrast, Special Counsel Lorenz testified when he gave his deposition in September 1986 that neither of those reasons entered into his decision to withhold approval.

QUESTION: Is it true that on behalf of the DOE you refused to approve this settlement agreement because it was untimely?

ANSWER: No, that was not the reason.

QUESTION: Is it true that you refused to approve the settlement agreement because it did not relate to matters properly compensable out of the escrow account?

ANSWER: That is not true, Mr. Munn. It is not true that that was a reason for withholding approval.

Tr. 11/26/86 at 20–21. When lead counsel for DOE was asked at the December 20, 1990, hearing to give the reasons for the withholding of approval, he departed drastically from the assertion DOE made to the court in its March 1986 memorandum. Tr. 12/20/90 at 31–43.

The suggestion has been made by DOE, through its counsel, that a factor in the withholding of approval was a belief that the settlement was made with improper motive or dishonestly. There was a hint of this in the first response made by DOE to Permian's request for approval of the settlement. Special Counsel Lorenz's June 7, 1985, letter, Amber Ex. 4 at 2–3. The motive and honesty of the parties in making the settlement agreement was questioned by DOE at several steps along the way. At page 2 of its March 18, 1986, memorandum, DOE made the accusation that the conduct of the parties to the settlement was "necessarily suspect." This accusation was repeated on page 6 of the

---

**7.** At page 6 of DOE's March 18, 1986, Memorandum in Support of DOE's Motion to Vacate the Order to Show Cause, the representation was made to the court that:

DOE has since consistently refused to approve the settlement agreement because it was untimely and did not relate to matters properly compensable out of the escrow account.

memorandum DOE filed on May 28, 1986. Improper motives were implied in remarks DOE's lead counsel made to the court at the July 14, 1986, hearing and, again, at the November 26, 1986, hearing. Tr. 7/14/86 at 11; Tr. 11/26/86 at 6. In contrast, when pointed inquiry was made of DOE's lead counsel on this subject at the December 30, 1990, hearing, the response was that there is no contention of impropriety on the part of Permian and the plaintiffs. Tr. 12/20/90 at 25–26. At the same hearing, lead counsel agreed that Permian's desire to take advantage of the escrowed funds for use in the Amber–E–Z settlement was legitimate, and special counsel said that he did not question Permian's good faith in making the settlement. *Id.* at 44, 121.

Another version of the "untimeliness" reason was given in a footnote on page 2 of a memorandum filed by DOE in this action on May 28, 1986:

> Aside from the fact that the complaint herein failed to state any legitimate cause of action against Permian, the department also rejected the purported settlement on the grounds that it had been submitted too late and after title to the escrowed funds had already vested in the United States Treasury.

At page 5 of the same document, DOE represented that it rejected the settlement because "the three year deadline passed on June 1, 1985 [and] the remaining balance in the escrow account belonged to the United States Treasury." Yet, at the December 20, 1990, hearing DOE, through its lead counsel, acknowledged that the court's May 29, 1985, order had the effect of impounding the funds in the escrow account, as contemplated by § 403(e) of the consent order. Tr. 12/20/90 at 15.

During the course of argument being presented by DOE's attorney at the July 14, 1986, hearing, the proposition seems to have been advanced that DOE considers that it has the option under the consent order either to engage in its approval function or to force the claims to be litigated, and that once the DOE has made the decision to force the claims to be litigated the matter of settlement should not be con-

sidered by the court. DOE's counsel explained this by saying:

> We, on the other hand, read the consent order differently. We believe that we have the right, in addition to rejecting approval, to enter a case as we have this case and to participate in the litigation and litigate it right to the end to protect the government's interest in this money. *And that is our reading of the consent order, that we can do it either way.* We are in this action, we don't want to have this settlement be looked at by the Court.

Tr. 7/14/86 at 28 (emphasis added). This same theme was implicit in comments made by DOE's lead counsel during the course of the Lorenz deposition:

> For the record, Mr. Munn, the circumstances have changed and as you are aware, the DOE has filed a motion for summary judgment which it now intends to pursue on the merits in this case to have this determined by means other than settlement. In other words, as a party to this case, the DOE would like to have the question of the statute of limitations determined on the merits and dispose of the case in that manner rather than by settlement.

Amber Ex. 6 at 657.

At another stage of the proceeding, DOE's position seems to have been that Amber and E–Z had no legitimate interest in the funds in the escrow account "because Permian is a large corporation, and presumably fully capable of satisfying any judgment which plaintiffs may obtain." Memorandum in Support of Motion for Partial Summary Judgment by Defendant Department of Energy at 6. This argument implies that DOE at one point was acting on the belief that it could reject a settlement if it thought Permian could respond to an adverse judgment.

At another point, during argument at the July 14, 1986, hearing, lead counsel for DOE solemnly represented that DOE rejected the settlement because "this Plaintiff has not been injured and is entitled to nothing":

We believe it's our money. Permian would like to settle this case out of that fund and I can understand that, but we don't believe that the Plaintiff has been injured and I think that the Motion for Summary Judgment, once the Court decides that, will determine that this Plaintiff has not been injured and is entitled to nothing. So I think that's where we stand. *And that is why the Department rejected this settlement.*

Tr. 7/14/86 at 11 (emphasis added). This same reason was repeated by the statement of DOE's counsel that:

The department rejected this settlement because the information produced indicated that there was no injury to be compensable out of this fund. They were not among the class of people that were injured.

Tr. 7/14/86 at 10. But, this same attorney acknowledged at the January 12, 1989, hearing that one of the counts of the complaint filed by Amber and E–Z that DOE has from time to time contended was outside the scope of the consent agreement appears, in fact, to be regulatory related. Transcript of 1/12/89 hearing at 49 [hereinafter cited as Tr. 1/12/89]. After coming to this realization, DOE then took the position that approval of settlement would not be given for yet a different reason, saying:

We would take the position if they were to submit another settlement agreement based upon Count 3 to us for payment out of this fund that it is too late, that it is barred by the limitation in the consent order agreement itself and that therefore we should not pay anything.

Tr. 1/12/89 at 50.

Another counsel for DOE gave as an explanation "why the Department has not agreed to approve this what we would say is a purported settlement agreement" that plaintiffs' claims are barred by limitations. Tr. 7/14/86 at 9–10. Lead counsel gave a different version of the statute of limitations reason for rejection of the settlement when he argued at the July 14, 1986, hearing as follows:

But in this case, no evidence has been presented of any injury due to the regu-

lations and, indeed, that's what our motion shows, that there is no injury and even if there were an injury it's barred by the Statute of Limitations. So that these claims in no event could be payable out of that fund.

*And that is really the basis that the Department rejected this settlement.*

Tr. 7/14/86 at 23 (emphasis added). When making a presentation to the court at the January 12, 1989, hearing, lead counsel for DOE gave as the *only* reason for rejection of the settlement that the claim "was barred by the Statute of Limitations," saying:

This settlement agreement was presented to the DOE on the last day in which such settlements could be submitted and taken from the fund. That was the deadline for such settlements. The DOE rejected that settlement offer after evaluating the claim on the obvious reason that it was barred by the Statute of Limitations.

Tr. 1/12/89 at 32. Though Assistant Special Counsel Geier, in his December 16, 1985, memorandum to Special Counsel Lorenz, suggested several reasons that might be used to justify rejection of the settlement, when the parties met on December 16, 1986, the focus was on the statute of limitations. Tr. 12/20/90 at 133–34.

The court has concluded that the true driving force in the non-approval of the settlement agreement, and the real reason why it was not approved, is the explanation given by DOE's lead counsel at the January 12, 1989, hearing that:

So our sole interest here is the protection of that fund which as the Court is aware has been impounded pending the outcome of this case. So as soon as this case is resolved, that entire two point—two and a quarter million dollars will be paid into the Treasury. *And that is our sole aim here is to get those funds released.*

Tr. 1/12/89 at 49 (emphasis added). In the final analysis, the only credible explanation given for DOE's refusal to approve the settlement was lead counsel's statement that "our sole aim here is to get those

funds released" for payment into the Treasury.[8]

This overriding goal, rather than an evaluation of the merits of the settlement agreement, explains why the settlement was not approved. The other reasons given by DOE for non-approval of the settlement are but excuses for DOE's improper conduct in arbitrarily declining to approve the settlement.

### Important Factors DOE Failed to Take into Account in Deciding Whether to Approve the Settlement

The important factors DOE failed to properly take into account when determining whether to withhold approval of the settlement are as notable as the inconsistencies and contradictions in the stated reasons why the settlement was not approved.

The attorney who negotiated the settlement on behalf of Permian was highly qualified and had expertise in matters such as this. Tr. 12/20/90 at 123–125. The negotiations for the settlement were in good faith and at arm's length. *Id.* at 128–31. Permian's counsel was of the opinion that the settlement was reasonable to both parties. *Id.* at 134–35. When the settlement was reached in May 1985, Permian's counsel considered that the statute of limitations question was very much an open one. *Id.* at 139–42. Counsel for Permian made known to DOE that they thought the settlement was a good settlement, considering Permian's exposure in the lawsuit. *Id.* at 43–44. DOE recognized at the time that Permian had competent lawyers, and did not question the quality of the legal representation Permian was receiving. *Id.* at

44. Those competent lawyers were representing to DOE that they thought the $2,250,000.00 settlement would be well-advised, considering Permian's exposure. *Id.* at 44. There was nothing illegitimate about Permian's desire to take advantage of the escrow fund that was set up for "that purpose." *Id.* at 47.

The high level of competence, and broad experience in matters of this kind, of counsel for Amber and E–Z was an important factor that should have been taken into account. *Id.* at 130.

DOE appears to have made the conscious decision to remain ignorant of other factors that logically should be known and taken into account for there to be an intelligent appraisal of the settlement. In addition to the things already discussed, examples are disclosed at the following places in the record: Tr. 12/20/90 at 98, 116–118; Amber Ex. 6 at 102, 103, 112; Amber Ex. 5 at 319, 344, 345, 396–97, 426–27.

The final decisionmaker, Special Counsel Lorenz, did not have the litigation experience that would enable him to evaluate the potential outcome of the controversy in a litigation setting. Amber Ex. 5 at 484–85.

The failure of DOE to take these factors into account confirms the court's conclusion that DOE's decision to withhold approval of the settlement was unreasoned and arbitrary.

### DOE Unreasonably Withheld Approval

The court is persuaded by the authorities provided by DOE in the memorandum it filed January 30, 1991, on the burden of proof question that Permian has the bur-

---

**8.** In one way or another this ultimate and overriding goal repeatedly surfaced. Geier's recommendation in the December 16, 1985, memo was that "we not approve the settlement agreement and request that Permian forward the $2.25 million to DOE." Amber Ex. 2 at 2. On page 2 of DOE's March 18, 1986, memorandum, it referred to the request that the escrow money be used for the settlement negotiated by Permian as an effort to take money "which, under the terms of the consent order, belong to the United States of America." As we have seen, DOE had a fixed opinion that "title to the escrowed funds had already vested in the United States Treasury." DOE's 5/28/86 memorandum at 2, 5

and 6. Counsel for DOE argued at the July 14, 1986, hearing that "the United States is not willing to take those funds which should now be in the Treasury and allow them to go to" Amber. Tr. 7/14/86 at 10. At that same hearing, counsel argued that "what they're trying to do is to settle this suit with the United States [sic] money in this fund." *Id.* at 11. When making a presentation at the November 26, 1986, hearing, lead counsel for DOE characterized the effort of Permian to obtain approval of the settlement agreement to be an attempt to impound $2,250,000.00 "of the escrow fund so that it would not revert to the Treasury as the agreement had intended." Tr. 11/26/86 at 6.

den to prove that DOE unreasonably withheld approval of the settlement, and that, if Amber and E–Z were to be permitted to contest the issue, they likewise would bear the burden of proof.

As with any other fact in issue, the reasonableness issue can be resolved by either direct or circumstantial evidence, or both. The only direct evidence on the subject of reasonableness of approval conduct of DOE was the opinion testimony given by Permian's counsel that DOE's approval of the settlement was unreasonably withheld. Tr. 12/20/90 at 135. And, the only direct evidence of reasonableness of the settlement, as viewed from the standpoint of the parties to the settlement agreement, was the testimony of Permian's counsel that the settlement was reasonable to both parties. *Id.* at 134–35. As noted above, there is significant circumstantial evidence that the withholding of approval was not a reasoned, informed decision based on the merits of the controversy that was being settled.

The court finds from a preponderance of the evidence, and concludes, that DOE unreasonably withheld approval of the settlement.

*Other Findings and Conclusions*

Facts stated by the court in the foregoing parts of this memorandum opinion are to be treated as facts found by the court by the preponderance of the evidence standard. In addition, the court specifically finds from a preponderance of the evidence that:

1. The settlement agreement in question was negotiated on an arms-length basis between Amber and Permian, and was entered into in good faith by Permian and Amber, based upon the relative risks of success of each party in the litigation.

2. Glen E. Clover, the attorney who negotiated the settlement in behalf of Permian, had considerable knowledge and experience regarding regulatory crude oil price controls, and had considerable experience in defending regulatory price control claims against Permian.

3. Cecil E. Munn, the attorney who negotiated the settlement agreement in behalf of Amber, had considerable litigation experience, including the assertion of regulatory pricing overcharge claims for various claimants.

4. Milton Lorenz, Special Counsel of the DOE, had been delegated the authority to grant or withhold DOE approval of settlements negotiated by Permian under the Consent Order.

5. Permian submitted the settlement agreement to the DOE on a timely basis in June 1985, formally requesting the DOE's approval pursuant to Section 403(b) of the Consent Order, Amber Exhibit 1.

6. DOE has withheld approval of the settlement; and, more than a reasonable time for DOE to make a decision as to whether to approve the settlement has elapsed.

7. If DOE had conducted itself properly, it would have approved the settlement no later than December 16, 1985.

8. If DOE had conducted itself properly, the $2,250,000.00 settlement amount would have been paid from the escrow account to Amber and E–Z no later than December 16, 1985.

9. In reviewing the settlement, Mr. Lorenz made no investigation to determine whether Permian had, or had not, overcharged Amber under the regulatory price controls, and Mr. Lorenz had no knowledge regarding the truth of Amber's claims of regulatory overcharges made against Permian. Amber Ex. 5 at 362; 319; 344; 348. In reviewing the settlement, Mr. Lorenz made no investigation to determine whether Permian had, or had not, overcharged Amber under the terms of the crude oil purchase agreement between Amber and Permian, and Mr. Lorenz had no knowledge regarding the truth of Amber's claims of contract overcharges made against Permian. Amber Ex. 5 at 426.

10. It was virtually impossible for Amber to detect or prove, prior to the filing of this case, the extent to which Permian may have exceeded regulatory

price ceilings with respect to prices charged Amber for crude oil, because Amber would have had to have had access to all of Permian's crude oil purchase and sales records, going back to May 1973. Tr. 12/20/90 (Lorenz testimony).

11. At the time the Amber settlement was concluded on May 29, 1985, Permian's pleaded defense of limitations to Amber's regulatory price overcharge claims was factually and legally questionable; and, such defense continued to be factually and legally questionable beyond the point in time when DOE, if it had acted within a reasonable period of time, would have made a final decision as to whether the settlement should be approved.

12. None of the reasons advanced by DOE for its failure to approve the settlement was a valid or reasonable reason for not approving the settlement.

13. Prior to the time the settlement agreement was concluded between Amber and Permian, Permian advised Paul Geier of DOE, by telephone, on May 29, 1985, that Amber had threatened to seek an order of this court impounding the entire remaining balance of the Escrow Account created under the Consent Order between Permian and DOE ("Consent Order"), that Permian would attempt to reach a settlement of the litigation with Amber, and limit the amount of the Escrow Account which might be impounded. Amber Ex. 1; Tr. 12/20/90 (Testimony of Glen E. Clover). DOE does not contend that it protested Permian's proposed course of action.

14. As a part of the settlement, Amber agreed to refrain from seeking an impoundment of the entire remaining balance ($13,203,665.00; Amber Exhibit 14) of the Escrow Account, and agreed to an impoundment of only $2,250,000.00 (Amber Ex. 1; Agreed Order dated May 29, 1985.

15. Amber's claims were unresolved by May 1985, and Amber, in a good faith effort to settle its claims, agreed on May 29 to forego any effort to impound the entire remaining balance of the Escrow Account. DOE was informed of Permian's effort to obtain that agreement from Amber and did not protest.

16. Mr. Lorenz's letter of June 7, 1985 (Amber Exhibit 4), and the allegations made by DOE in its various motions and supporting memoranda filed in this case, e.g., Memorandum in Support of Motion for Partial Summary Judgment, filed May 28, 1986, at 2 and 5, evidence an intention by DOE, from June 7, 1985, forward, to claim and acquire the $2,250,000.00 impounded in the Escrow Account for delivery to the U.S. Treasury, and negates any effort by DOE to review the Amber settlement objectively, and in good faith, to carry out the purposes of the Escrow Account to settle and resolve third-party claims against Permian.

The court further concludes that:

1. The court has jurisdiction over the parties and the subject matter before the court.

2. In 1985 Amber constituted a third party asserting claims arising from Specified Transactions, as those words are used in Section 403(b) of the Consent Order. The settlement negotiated by Permian with Amber and E–Z was a settlement of those claims.

3. By their execution of the Consent Order, Permian and DOE agreed that $14.5 million of the Permian refund to settle potential administrative claims by DOE should be used to pay refunds Permian might have to make in response to claims by private litigants under § 210 of the Economic Stabilization Act of 1970. Accordingly, the reasonableness of DOE's action in rejecting the Amber settlement is directly in issue here, and makes DOE an appropriate party in this case with respect to that issue.

4. The Consent Order delegated to Permian the sole authority to negotiate and enter into a settlement agreement with Amber, provided such settlement was negotiated at armslength, and in good faith, by Permian.

5. This court's Agreed Order of May 29, 1985, was the type of court order

contemplated under Section 403(e) of the Consent Order.

6. The settlement agreement is in full force and effect.

7. The amount of $2,250,000.00 should be paid to Amber and E–Z out of the escrow account in payment of the $2,250,000.00 settlement amount contemplated by the settlement agreement.

## ORDER

The court, therefore, ORDERS, ADJUDGES, DECREES and DECLARES that:

1. DOE unreasonably withheld approval of the settlement agreement in question.

2. The settlement agreement is in full force and effect.

3. Amber and E–Z are entitled to be paid out of the escrow account in question the amount of TWO MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($2,250,000.00) in payment of the $2,250,000.00 amount specified in the settlement agreement.

4. The trial of all issues raised by the pleadings in this case that have not been resolved by this memorandum opinion and order shall be held, as scheduled, at 9:00 a.m. on March 25, 1991.

5. No later than 3:00 p.m. on March 20, 1991, the parties shall deliver to the court a joint pretrial order in compliance with the pretrial instructions currently in use by the court, copies of which have been furnished to the parties. The pretrial order shall define the status of, and issues in, this action as it exists following this memorandum opinion and order. The trial of this case will be limited to the issues defined in the pretrial order.

6. No later than 2:00 p.m. on March 20, 1991, the parties shall have a face to face conference relative to settlement of all claims in this action. Each party shall be represented at the conference by a person who has authority to agree to a settlement of all claims and causes of action that are in dispute in this action. The settlement conference will be held in the offices of counsel for the plaintiffs. The parties shall deliver to the court no later than 4:00 p.m. on March 20, 1991, a joint report concerning, in a general way, the progress made toward settlement at the settlement conference. The report need not disclose dollar amounts. It will inform the court of the identity and title of each person who participated in the conference and the identity of each party on whose behalf each such person participated and will be signed by counsel for each party.

## MEMORANDUM OPINION

### March 29, 1992

On March 25, 1991, came on to be heard the final phase of the trial in the above-styled and numbered action. Reference is made to the memorandum opinion and order signed by the court March 13, 1991, for the background of the litigation and a definition of the issues that were tried and resolved at the initial trial phase, conducted December 20, 1990. This memorandum opinion and order is written on the assumption that its reading will follow a reading of the March 13, 1991, memorandum opinion.

Basically, the issues that remain for resolution at the final trial phase are (i) the counterclaim of Occidental Oil and Gas Company ("Occidental")[1] against Amber

1. Pursuant to an unopposed motion filed by Permian, the court ordered on March 25, 1991, that Occidental, as successor-in-interest to Permian, be substituted for Permian as a defendant in this action. The parties have stipulated that:

4. At all material times prior to December 1, 1983, Permian and Occidental Oil and Gas Company ("Occidental") were affiliates directly or indirectly under common ownership.

5. Effective December 1, 1983, after the execution and approval of the Consent Order between DOE and Permian, and after the exe-

cution and approval of the Escrow Agreement, and after the filing of this lawsuit, Permian was sold and the claims, rights, and obligations of Permian in all matters relating to the Escrow Account, the Consent Order, the Escrow Agreement, the claims of Plaintiffs herein, and Permian's Counterclaim and Cross–Claim herein, were retained by or transferred to Occidental.

6. Since December 1, 1983, both Plaintiffs and the DOE have dealt, in all matters involved in this lawsuit, with Occidental as the

and E–Z, (ii) the matter of the amount of interest, if any, to be recovered because of nonpayment of the settlement amount out of the escrow account, and (iii) litigation expenses, if any, recoverable by Occidental.

The court adopts as findings and conclusions of the court the contents of the March 25, 1991, stipulation of the parties. Pltfs. Ex. 99 (3/25/91 hearing).

### Occidental's Counterclaim

■ Amber, E–Z and Occidental have reached a settlement as to Occidental's counterclaim, the terms and conditions of which are as follows:

(a) Judgment may be entered on the counterclaim for Occidental against plaintiffs in the amount of $456,705.18 if judgment is entered in favor of the plaintiffs for the principal amount of the settlement, which is $2,250,000.

(b) Occidental's demand against the plaintiffs for prejudgment interest and attorneys' fees may be denied. Occidental does not waive its right to post-judgment interest on its counterclaim.

(c) The judgment on Occidental's counterclaim against plaintiffs shall not be or constitute a lien on assets of the plaintiffs and shall not be due and payable unless and until the judgment to be entered in this cause in favor of the plaintiffs in the principal amount of the settlement, which is $2,250,000, becomes final and no longer subject to appeal.

(d) If the judgment to be entered in favor of the plaintiffs should be reserved in whole or in part on appeal as to the principal amount of the settlement, which is $2,250,000, the judgment on the counterclaim shall become null and void and no recovery shall be awarded to Occidental unless and until a trial thereon is had and the court shall have determined by a preponderance of the evidence that Occidental is entitled to recover on the

counterclaim and the proper amount of such recovery, if any.

(e) The judgment in favor of Occidental on its counterclaim shall not be offset or netted against plaintiffs' judgment to be paid out of the Escrow Account or by the DOE.

Text of stipulation contained in judgment form submitted to the court by counsel for plaintiffs and Occidental, respectively, at March 25, 1991, trial.

The court approves this settlement and will cause the final judgment in this action to put the terms and conditions of this settlement in effect.

### The Judgment to be Entered as to the $2,250,000.00 Principal Amount

The court makes the following additional findings and conclusions:

1. Under Section 701 of the consent order, Permian reserved the right to maintain a civil action to secure enforcement of the terms of the consent order, including requiring DOE not to unreasonably withhold its approval of settlements negotiated and entered into by Occidental for payment out of the escrow account.

2. DOE's bad faith, arbitrary and unreasonable withholding of approval of the settlement prevented a payment to plaintiffs of a payment required by the consent order.

3. One purpose of the consent order was for Permian to act as a conduit for the payment of claims against Permian growing out of Permian's sale, purchase or handling of crude oil and which might potentially decrease Permian's revenues or increase its costs.

4. All persons with such claims were intended beneficiaries of the consent order.

5. Amber and E–Z were persons with such claims.

real party in interest to those matters previously involving Permian.

7. For purposes of construing or applying the Consent Order and the Escrow Agreement in regard to the matters involved in this litiga-

tion, the name "Occidental" may be substituted for the name of "Permian".

Stipulation, Pltfs. Ex. 99 (3/25/91 hearing) at 1–2.

6. DOE's proper performance under the consent order would have satisfied the claims of Amber and E–Z against Permian (Occidental) no later than December 16, 1985.

7. Amber and E–Z are creditor beneficiaries of the consent order.

8. Amber and E–Z accepted the consent order by agreeing to the settlement with Permian, by demanding performance from DOE, and by seeking judicial relief on the basis of the consent order.

9. Under the consent order, the amount of $2,250,000.00 became due and payable by DOE when DOE unreasonably withheld its approval of the settlement between Occidental, Amber and E–Z, which occurred no later than December 16, 1985. This amount became payable to Occidental and plaintiffs for the ultimate benefit of plaintiffs, and the obligation to pay is an absolute payment obligation of DOE, but which can be satisfied by use of the amount of $2,250,000.00 in the escrow account.

Consistent with such findings and conclusions and the rulings made by the court in the court's March 13, 1991, memorandum opinion and order, and taking into account the preference of DOE, as expressed by its lead counsel at the March 25, 1991, trial, as to the identity of its judgment creditor, the court has concluded that a judgment should be entered in favor of occidental against DOE for the amount of $2,250,000.00, which payment obligation can be satisfied by a payment of that amount out of the escrow account, and that a judgment should be entered in favor of plaintiffs against Occidental in the same amount, to be payable promptly after receipt by Occidental of that amount from DOE or the escrow account.

### The Matter of Prejudgment Interest

 Stipulations of the parties with respect to the escrow account contemplated by the consent order include the following:

1. In compliance with the Consent Order between the United States Department of Energy ("DOE") and The Permian Corporation ("Permian") dated March 5, 1982, and effective June 1, 1982, Permian established an interest-bearing Escrow Account with BANK OF THE SOUTHWEST NATIONAL ASSOCIATION, HOUSTON, of Houston, Texas, as escrow agent.

2. The successor escrow agent is Ameritrust Texas, N.A., which is now holding and administering the Escrow Account as Account Number 4855559008.

3. Plaintiffs' Exhibit No. 100 is a true copy of the Escrow Agreement entered into by Permian and Bank of the Southwest National Association, Houston, and approved by the DOE.

. . . .

10. The amount of interest earned by and attributable to the $2,250,000 impounded in the Escrow Account pursuant to the Court's Order signed May 29, 1985, subsequent to December 16, 1985, which has been distributed out of the Escrow Account to the DOE, is $756,588.76. That interest is still held by the DOE.

11. The amount of interest earned by and attributable to the impounded $2,250,000 that was still in the Escrow Account as of March 21, 1991, is $34,979.71.

Stipulation, Pltfs. Ex. 99 (3/25/91 hearing) at 1–3. The court has concluded that Occidental, itself and on behalf of plaintiffs, and plaintiffs directly are equitably entitled to all interest earned from and after December 16, 1985, on the amount of $2,250,000.00 impounded in the escrow account by the court's order of May 29, 1985.

DOE maintains that, even if it has wrongfully caused the $2,250,000.00 settlement amount to be impounded in the escrow account at all time since December 16, 1985 (the date no later than which that amount would have been paid out of the escrow account to plaintiffs if DOE had conducted itself properly), it should receive the full benefit of all interest earned on the escrow account. Try as it may, DOE has not been able to come up with a sensible explanation for such an absurd contention. It resorted at the March 25, 1991, hearing

to reliance on the part of the escrow agreement that reads as follows:

> The interest income earned on this Escrow Account shall accrue to said Account and, *for all federal and state tax purposes,* shall be income of the government of the United States of America, regardless of the date the balance of said Account is remitted to third parties as provided in paragraph 2 above, or to the United States Treasury or in accordance with a court order, whichever occurs later, as provided in paragraph 5 above.

Escrow Agreement, Pltfs. Ex. 100 at 3 (emphasis added). But, the obvious purpose of the emphasized language was to obviate the necessity of identifying a taxpayer who would be required to pay income taxes on accrued interest to be distributed in the future to unidentified beneficiaries. No rational argument can be made that the language had as its objective overriding the general rule, which the court concludes applies to this action, that any interest on a deposited fund follows the principle and is to be allocated to those who ultimately prove to be owners of that principal. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980); *Amoco Transport Company v. Dietze, Inc.,* 582 F.Supp. 804, 806–07 (S.D.N.Y.1984).

Indeed, the wording of the consent order leaves no doubt that interest earned on funds in the account are to follow amounts in the account that should be paid from it. After setting forth the understanding and express contention of Permian and DOE that the consent order constitutes a legally enforceable contractual undertaking, section 701 of the consent order provides:

> Notwithstanding any other provision herein, Permian and DOE each reserves the right to institute a civil action in an appropriate United States district court, if necessary, to secure enforcement of the terms of this Consent Order, *including payment of interest for each day any payment required by this Consent Order is late.*

Amber Ex. 7 (12/20/90 hearing) at 23 (emphasis added). The parties could not have more pointedly provided that interest earned on the escrow account is to follow any payment that is required by the consent order to be made. Bearing in mind the conclusion that already has been reached that the settlement agreement between Permian, Amber and E–Z should have been approved by DOE and that the settlement was of claims arising from "specified transactions," within the meaning of the consent order, there is no doubt that the $2,250,000.00 settlement amount is a payment that was required by the consent order to be made. *Id.* § 504(b) at 7. That payment has been "late" at all times since no later than December 16, 1985.

DOE quite clearly has no entitlement whatsoever to any of the interest earned since December 16, 1985, on the $2,250,000.00 part of the escrow account fund that should have been paid to plaintiffs, or to Permian for plaintiffs' benefit, no later than that date. Inasmuch as DOE acted improperly in receiving interest earned on that part of the fund after December 16, 1985, the court has concluded that a judgment should be entered for Occidental against DOE [2] for the amount of all interest received by it that has been earned on the $2,250,000.00 part of the escrow fund since December 16, 1985, which, according to the stipulation of the parties, is $756,588.76, and that plaintiffs should have judgment against Occidental in the same amount, payable promptly after receipt by Occidental of the amount to be paid to it by DOE.[3]

Of course, DOE is not entitled to the benefit of the accrued interest that remains in the escrow account, which the parties have stipulated is in the amount of $34,979.71 as of March 21, 1991. In keeping with the preference of DOE, the court has concluded that a judgment in the amount of

---

**2.** At the March 25, 1991, hearing, lead counsel for DOE stated in the record that DOE is the government entity against which judgment should be entered if the determination is made that the government is obligated to repay the interest.

**3.** DOE, through its lead counsel, expressed the preference at the March 25, 1991, trial that any judgment against it on the interest issue be in favor of Occidental rather than plaintiffs, with the thought that Occidental would serve as a conduit of the interest recovery to plaintiffs.

$34,979.71 should be entered in favor of Occidental against DOE, payment of which can be satisfied by payment of that amount out of the escrow account, and that plaintiffs shall have a judgment against Occidental in the same amount, which shall be payable promptly after receipt by Occidental of such amount from DOE or out of the escrow account.

*The Request by Occidental for Recovery of Attorney's Fees*

By amended cross-complaint filed by Occidental on March 25, 1991, Occidental requested *inter alia* recovery of attorney's fees from DOE. Lead counsel for DOE expressed at the March 25 hearing that it objected to the late filing of the request for attorney's fees, but when given an opportunity to have a continuance and to further prepare on that subject, counsel for DOE announced that he was ready to proceed and that he did not want additional time. On March 28, 1991, DOE filed its memorandum on attorney's fees. Thereafter, Occidental filed its formal application for fees.

Occidental relies, in support of its request for fees, on 28 U.S.C. § 2412(b), which provides, in pertinent part, as follows:

> A court may award reasonable fees and expenses of attorneys ... to the prevailing party ... in any civil action brought ... against ... any agency or any official of the United States ... [and the] United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law....[4]

This section of the Equal Access to Justice Act has been interpreted by the courts as incorporating the "'American rule' for fee-shifting." *Cinciarelli v. Reagan*, 729 F.2d 801, 804 n. 2 (D.C.Cir.1984). The American rule permits a fee award when the losing party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (quoting *F.D. Rich Co. v.*

*Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). *See also Linquist v. Brown*, 839 F.2d 1321, 1323 (8th Cir.1988); 28 U.S.C. § 2412(c)(2) (agencies are not directly responsible for the payment of fees awarded under 28 U.S.C. § 2412(b) unless "the basis for the award is a finding that the United States acted in bad faith ..."). A party acts in bad faith when "the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." *Fitzgerald v. Hampton*, 545 F.Supp. 53, 57 (D.D.C.1982).

The court finds that (i) Occidental has incurred attorney's fees in the amount of $157,000.00 since December 16, 1985, exclusive of fees and expenses incurred in connection with its counterclaim against plaintiffs, solely as a result of DOE's unreasonable withholding of approval of the settlement, (ii) $157,000.00 is a fair and reasonable amount in this area for the legal services rendered to Occidental in connection with such matters, (iii) Occidental incurred such attorney's fees because of bad faith conduct of the United States of America, acting through DOE, (iv) DOE forced Occidental to incur these attorney's fees by its unreasonable and bad faith conduct in arbitrarily declining to approve the settlement agreement in question, and (v) by DOE's improper conduct, DOE forced Occidental to engage in otherwise unnecessary litigation to enforce its plain legal rights. Therefore, the court is ordering that Occidental recover from DOE the amount of $157,000.00 as attorney's fees.

A final judgment consistent with this memorandum opinion and the memorandum opinion and order signed by the court on March 13, 1991, is being signed on this date.

The court so ORDERS.

---

4. Section 2412(b) contains no maximum per-hour billing rate but, instead, requires only that the fees and expenses be "reasonable." In contrast, 28 U.S.C. § 2412(d) makes an award of attorney fees obligatory to a "prevailing party" (note "shall") unless the government maintains its burden of establishing that its position was "substantially justified," but also limits attorney fees to $75.00 per hour in the absence of "special factors."