WEBB'S FABULOUS PHARMACIES, INC., ET AL. *v.*
BECKWITH, CLERK OF THE CIRCUIT
COURT OF SEMINOLE COUNTY,
ET AL.

No. 79–1033.   Argued October 14, 15, 1980—Decided December 9, 1980

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Harvey M. Alper* argued the cause and filed a brief for appellants.

*Harry A. Stewart* argued the cause for appellees. With him on the brief were *Gerald L. Knight* and *Nikki Clayton.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether it is constitutional for a county to take as its own, under the authority of a state statute, the interest accruing on an interpleader fund deposited in the registry of the county court, when a fee, prescribed by another statute, is also charged for the clerk's

services in receiving the fund into the registry. The statute which is the object of the constitutional challenge here is Fla. Stat. §28.33 (1977).[1]

## I

On February 12, 1976, appellant Eckerd's of College Park, Inc., entered into an agreement to purchase for $1,812,145.77 substantially all the assets of Webb's Fabulous Pharmacies, Inc. Both Eckerd's and Webb's are Florida corporations. At the closing, Webb's debts appeared to be greater than the purchase price. Accordingly, in order to protect itself and as permitted by the Florida Bulk Transfers Act, Fla. Stat. § 676.106 (4) (1977),[2] Eckerd's filed a complaint of interpleader in the Circuit Court of Seminole County, Fla., inter-

---

[1] Section 28.33, enacted as 1973 Fla. Laws, ch. 73–282, § 1, reads in pertinent part:

"The clerk of the circuit court in each county shall make an estimate of his projected financial needs for the county and shall invest any funds in designated depository banks in interest-bearing certificates or in any direct obligations of the United States in compliance with federal laws relating to receipt of and withdrawal of deposits. . . . Moneys deposited in the registry of the court shall be deposited in interest-bearing certificates at the discretion of the clerk, subject to the above guidelines. . . . *All interest accruing from moneys deposited shall be deemed income of the office of the clerk of the circuit court* investing such moneys and shall be deposited in the same accounts as are other fees and commissions of the clerk's office. Each clerk shall, as soon as is practicable after the end of the fiscal year, report to the county governing authority the total interest earned on all investments during the preceding year." (Emphasis supplied.)

[2] Section 676.106 (4), which derives from the Uniform Commercial Code, reads:

"A transferee may within ten days after taking possession of the goods, discharge his obligations under this section by an action in the circuit court for the county where the transferor had his principal place of business in this state interpleading all creditors in the list of creditors required by [§] 676.104. In such event the court shall require the consideration to be deposited into the registry of the court and thereupon shall decree the goods to be free and clear of the claims of such creditors and that such creditors should file their claims with the court."

pleading as defendants both Webb's and Webb's creditors (almost 200 in number) and tendering the purchase price to the court.

Pursuant to § 676.106 (4), the Circuit Court thereupon ordered that the amount tendered be paid to the court's clerk and that the clerk deposit it "in an assignable interest-bearing account at the highest interest." App. 4a. The court specifically reserved decision on the issue of entitlement, as between the clerk and Webb's creditors, to the interest earned on the fund while so deposited, stating that the transfer to the clerk was without prejudice to the creditors' claims to that interest. *Id.*, at 4a–5a. Eckerd's tendered the sum to the clerk on July 13, 1976, *id.*, at 6a, and that official proceeded to make the required investment.

The clerk deducted from the interpleader fund so deposited the sum of $9,228.74 as his fee, prescribed by Fla. Stat. § 28.24 (14) (1977),[3] "for services rendered" for "receiving money into the registry of court." The fee, as the statute directed, was calculated upon the amount placed in the registry, that is, 1% of the first $500, and ½% of the remainder.

On July 5, 1977, almost a year after the tender and payment, the Circuit Court upon its own motion[4] appointed a receiver for Webb's. Among the receiver's stated duties were

---

[3] Section 28.24, as then in force, read in pertinent part:

"The clerk of the circuit court shall make the following charges for services rendered by his office in recording documents and instruments and in performing the duties enumerated:

.          .          .          .          .

"(14) For receiving money into the registry of court:

"(a) First $500.00, percent.................................... 1
"(b) Each subsequent $100.00, percent......................... ½"

The statute has since been amended in ways not relevant to the present litigation.

[4] The appellants suggest that the court acted *sua sponte* because of the continuing insistence of the clerk and Seminole County that the county was entitled to the interest being earned on the fund, and to bring the interest period in controversy to an end. Brief for Appellants 10.

the determination of the number and amount of claims filed against the interpleader fund and the preparation and filing with the court of a list of those claims. App. 9a. The receiver filed a motion for an order directing the clerk to deliver the fund to him. *Id.*, at 12a. The motion was granted. *id.*, at 14a, and the principal of the fund, reduced by the $9,228.74 statutory fee and by $40,200 that had been paid out pursuant to court order, was paid to the receiver on July 21. The interest earned on the interpleader fund while it was held by the clerk, but which was not turned over to the receiver, then exceeded $90,000. Interest earned thereafter on the amount so retained brought the total to more than $100,000. Tr. of Oral Arg. 34. It is this aggregate interest that is the subject matter of the present litigation. Appellants make no objection to the clerk's statutory fee of $9,228.74 taken pursuant to § 28.24 (14). Tr. of Oral Arg. 6: Brief for Appellants 6, 9.

The receiver then moved that the court direct the clerk to pay the accumulated interest to the receiver. App. 22a, 26a, 33a. The Circuit Court ruled favorably to the receiver, holding that the clerk "is not entitled to any interest earned, accrued or received on monies deposited in the registry of this Court pursuant to the Court's order . . . ; the creditors herein are the rightful parties entitled to all such interest earned on the interpleader fund while it is held by the Clerk of this Court." *Id.*, at 35a.

Seminole County and the clerk appealed to the Florida District Court of Appeal. That court transferred the cause to the Supreme Court of Florida. The Supreme Court, in a *per curiam* opinion with one justice dissenting in part, ruled that § 28.33 was "constitutional" and reversed the judgment of the Circuit Court. 374 So. 2d 951 (1979). The stated rationale was that a fund so deposited is "considered 'public money' " from the date of deposit until it leaves the account: that "the statute takes only what it creates"; and that "[t]here is no unconstitutional taking because interest earned on the clerk

of the circuit court's registry account is not private property."
*Id.*, at 952–953.[5]

Because it had been held elsewhere that a county's appro-
priation of the interest earned on private funds deposited in
court in an interpleader action is an unconstitutional taking,
*Sellers* v. *Harris County*, 483 S. W. 2d 242 (Tex. 1972); see
*McMillan* v. *Robeson County*, 262 N. C. 413, 137 S. E. 2d
105 (1964), we noted probable jurisdiction. 445 U. S. 925
(1980).

## II

It is at once apparent that Florida's statutes would allow
respondent Seminole County to exact two tolls while the inter-
pleader fund was held by the clerk of the court. The first

---

[5] Although it is not entirely clear that the federal constitutional issue
was presented to the Circuit Court, the propriety of the clerk's claim to
the interest was clearly raised there as an issue under the Florida Con-
stitution. See p. 6 of the receiver's memorandum in support of his motion
for direction to the clerk to remit (p. 77 of the Original Record on
Appeal). That memorandum, however, contains at least one reference to
"pertinent provisions of the *Florida Constitution* and its Federal counter-
part" (emphasis in original), *ibid.*, and there are "due process" arguments
beginning at p. 4 of the receiver's reply memorandum. Furthermore, the
Circuit Court, in granting the receiver's motion for a *nunc pro tunc* order
correcting an omission from the record, specifically stated that § 28.33
and 1973 Fla. Laws, ch. 73–282, "are unconstitutional to the extent that
the provisions thereof pertain to private monies held in the registry of the
court in pending litigation and specifically to those monies held in the
registry of the court in this case." App. 40a–41a.

In any event, the federal constitutional issue appears to have been
raised in the Supreme Court of Florida. See Tr. of Oral Arg. 4. While
there is no specific reference to the Federal Constitution in the court's
*per curiam* opinion, the court spoke specifically of the receiver's argument
that the statute "constitutes either a taking without due process of law or
an unlawful tax," 374 So. 2d, at 952, and ruled that there was "no uncon-
stitutional taking." *Id.*, at 953. We are satisfied that the Supreme Court
of Florida upheld the statute against both federal and state constitutional
challenges. This is a sufficient base for this Court's consideration of the
federal issue.

was the statutory fee of $9,228.74 "for services rendered," as § 28.24 recites, by the clerk's office for "receiving money into the registry of court." That fee was determined by the amount of the principal deposited.

The second would be the retention of the amount, in excess of $100,000, consisting of "[a]ll interest accruing from moneys deposited." This toll would be exacted because of § 28.33's provision that the interest "shall be deemed income of the office of the clerk of the circuit court."

An initial reading of § 28.33 might prompt one to conclude that, so far as it concerns entitlement to interest, the statute applies only to interest on funds clearly owned by the county (such as charges for certifications) and that it does not apply to interest on private funds deposited under the direction of another statute. The Florida Supreme Court, however, has read § 28.33 otherwise and has ruled that it applies to interest earned on deposited private funds. That reading of the State's statute is within the Florida court's competency, and we must take the statute as so read and interpreted.

## III

The pertinent words of the Fifth Amendment of the Constitution of the United States are the familiar ones: "nor shall private property be taken for public use, without just compensation." That prohibition, of course, applies against the States through the Fourteenth Amendment. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 239 (1897); *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 122 (1978). Our task is to determine whether the second exaction by Seminole County amounted to a "taking"— it was obviously uncompensated—within the Amendment's proscription.

The principal sum deposited in the registry of the court plainly was private property, and was not the property of Seminole County. This is the rule in Florida, *Phipps* v. *Watson,* 108 Fla. 547, 551, 147 So. 234, 235 (1933), as well as

elsewhere. See *Coudert* v. *United States,* 175 U. S. 178 (1899); *Branch* v. *United States,* 100 U. S. 673 (1880); *Sellers* v. *Harris County,* 483 S. W. 2d, at 243. We do not understand that the appellees contend otherwise so far as the fund's principal is concerned.

Appellees submit, Tr. of Oral Arg. 26, 29—and we accept the proposition—that, apart from statute, Florida law does not require that interest be earned on a registry deposit. See 374 So. 2d, at 953. We, of course, also accept the further proposition, pressed upon us by the appellees, that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972). But a mere unilateral expectation or an abstract need is not a property interest entitled to protection. See, for example, *Fox River Paper Co.* v. *Railroad Comm'n,* 274 U. S. 651 (1927); *United States* v. *Willow River Power Co.,* 324 U. S. 499 (1945). See also *Penn Central Transportation Co.* v. *New York City, supra; Andrus* v. *Allard,* 444 U. S. 51 (1979).

Webb's creditors, however, had more than a unilateral expectation. The deposited fund was the amount received as the purchase price for Webb's assets. It was property held only for the ultimate benefit of Webb's creditors, not for the benefit of the court and not for the benefit of the county. And it was held only for the purpose of making a fair distribution among those creditors. Eventually, and inevitably, that fund, less proper charges authorized by the court, would be distributed among the creditors as their claims were recognized by the court. The creditors thus had a state-created property right to their respective portions of the fund.

It is true, of course, that none of the creditor claimants had any right to the deposited fund until their claims were recognized and distribution was ordered. See *Aron* v. *Snyder,* 90

U. S. App. D. C. 325, 327, 196 F. 2d 38, 40, cert. denied, 344 U. S. 854 (1952). That lack of immediate right, however, does not automatically bar a claimant ultimately determined to be entitled to all or a share of the fund from claiming a proper share of the interest, the fruit of the fund's use, that is realized in the interim. To be sure, § 28.33 establishes as a matter of Florida law that interest is to be earned on deposited funds. But the State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest.

We therefore turn to the interest issue. What would justify the county's retention of that interest? It is obvious that the interest was not a fee for services, for any services obligation to the county was paid for and satisfied by the substantial fee charged pursuant to § 28.24 and described specifically in that statute as a fee "for services" by the clerk's office. Section 28.33, in contrast, in no way relates the interest of which it speaks to "services rendered." Indeed, if the county were entitled to the interest, its officials would feel an inherent pressure and possess a natural inclination to defer distribution, for that interest return would be greater the longer the fund is held; there would be, therefore, a built-in disincentive against distributing the principal to those entitled to it.

The usual and general rule is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal. See, e. g., James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F. 2d 451, 463 (CA5), cert. denied sub nom. City Trade & Industries, Ltd. v. Allahabad Bank, Ltd., 404 U. S. 940 (1971); Murphy v. Travelers Ins. Co., 534 F. 2d 1155, 1165 (CA5 1976); In re Brooks & Woodington, Inc., 505 F. 2d 794, 799 (CA7 1974); McMillan v. Robeson County, 262 N. C., at 417, 137 S. E. 2d, at 108; Sellers v. Harris County, 483 S. W. 2d, at 243; Southern Oregon Co. v. Gage, 100 Ore. 424, 433, 197 P. 276, 279 (1921); Board of Law Library

*Trustees* v. *Lowery,* 67 Cal. App. 2d 480, 154 P. 2d 719 (1945); *Kiernan* v. *Cleland,* 47 Idaho 200, 273 P. 938 (1929).[6]

The Florida Supreme Court, in ruling contrary to this long established general rule, relied on the words of § 28.33 and then proceeded on the theory that without the statute the clerk would have no authority to invest money held in the registry, that in some way the fund assumes temporarily the status of "public money" from the time it is deposited until it leaves the account, and that the statute "takes only what it creates." Then follows the conclusion that the interest "is not private property." 374 So. 2d, at 952–953.

This Court has been permissive in upholding governmental action that may deny the property owner of some beneficial use of his property or that may restrict the owner's full exploitation of the property, if such public action is justified as promoting the general welfare. See, *e. g., Andrus* v. *Allard,* 444 U. S., at 64–68; *Penn Central Transportation Co.* v. *New York City,* 438 U. S., at 125–129.

Here, however, Seminole County has not merely "adjust[ed] the benefits and burdens of economic life to promote the common good." *Id.,* at 124. Rather, the exaction is a forced contribution to general governmental revenues, and it is not reasonably related to the costs of using the courts. Indeed, "[t]he Fifth Amendment's guarantee . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960).

No police power justification is offered for the deprivation. Neither the statute nor appellees suggest any reasonable basis to sustain the taking of the interest earned by the interpleader fund. The county's appropriation of the beneficial use of the

---

[6] The appellees at oral argument conceded that if coupon bonds, rather than cash, had been deposited in the registry, the coupons would follow the principal and could not be claimed by the county under § 28.33. Tr. of Oral Arg. 31.

fund is analogous to the appropriation of the use of private property in *United States* v. *Causby,* 328 U. S. 256 (1946). There the Court found a "taking" in the Government's use of air space above the claimant's land as part of the flight pattern for military aircraft, thus destroying the use of the land as a chicken farm. "*Causby* emphasized that Government had not 'merely destroyed property [but was] using a part of it for the flight of its planes.'" *Penn Central,* 438 U. S., at 128, quoting from *Causby,* 328 U. S., at 262–263, n. 7.

Neither the Florida Legislature by statute, nor the Florida courts by judicial decree, may accomplish the result the county seeks simply by recharacterizing the principal as "public money" because it is held temporarily by the court. The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property. The state statute has the practical effect of appropriating for the county the value of the use of the fund for the period in which it is held in the registry.

To put it another way: a State, by *ipse dixit,* may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power.

## IV

We hold that under the narrow circumstances of this case— where there is a separate and distinct state statute authorizing a clerk's fee "for services rendered" based upon the amount of principal deposited; where the deposited fund itself concededly is private; and where the deposit in the court's registry is required by state statute in order for the depositor to avail itself of statutory protection from claims of creditors and others—Seminole County's taking unto itself, under § 28.33 and 1973 Fla. Laws, ch. 73–282, the interest earned

on the interpleader fund while it was in the registry of the court was a taking violative of the Fifth and Fourteenth Amendments. We express no view as to the constitutionality of a statute that prescribes a county's retention of interest earned, where the interest would be the only return to the county for services it renders.

The judgment of the Supreme Court of Florida is reversed.

*It is so ordered.*