**BROUGHTON LUMBER COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1402 L.**

United States Court of Federal Claims.

Jan. 12, 1994.

---

Michael E. Haglund, Portland, OR, attorney of record for plaintiff.

Dorothy R. Burakreis, Dept. of Justice and Eric C. Olson, Dept. of Agriculture, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

This is a suit to recover just compensation under the Fifth Amendment for the claimed taking, by federal legislation, of the alleged right to apply a state-granted water right to the generation of hydroelectric power for commercial purposes.

Defendant has moved for summary judgment on the ground that plaintiff's planned change in use is subject to numerous state and federal licensing determinations, none of whose requirements have yet been satisfied and all of whose outcomes are uncertain.

Thus, defendant maintains that the property interest purportedly taken—an expectation of deriving significant economic value from the water right through its application to a hydroelectric power generator—is at this point too conjectural a usage to qualify as a compensable interest.

Plaintiff opposes defendant's motion and cross-moves for partial summary judgment in its favor. Oral argument was heard on December 7, 1993. We conclude that, in light of the significant obstacles posed by preexisting federal and state regulations, plaintiff possessed no compensable expectancy in the use of its water right for hydroelectric generation. Accordingly, we find no basis upon which to support the claimed taking.

### Background

Plaintiff is a logging company that holds a right to appropriate 30 cubic feet per second (cfs) of water from the Little White Salmon River for diversion into a flume used in the transportation of rough-cut timber from a sawmill to a down-river planing site. Having decided that the flume was outdated and no longer worth the cost of maintenance, plaintiff discontinued its operation in December of 1986. It was plaintiff's intent to seek licensing approval to convert the water right to what it believed was the only remaining viable economic use: the generation of hydroelectric power.

With that purpose in mind, on July 1, 1986, plaintiff filed an application with the Federal Energy Regulatory Commission (FERC), requesting a preliminary permit for a small hydroelectric project.[1] This permit was issued on February 10, 1987.

Approximately four months earlier, however, in November of 1987, Congress and the states of Oregon and Washington had passed legislation, known as the Columbia River Gorge National Scenic Area Act (Gorge Act), 16 U.S.C. §§ 544–544p (1988); Or.Rev.Stat. §§ 196.150–.165 (1991); Wash.Rev.Code §§ 43.97.015–.035 (1992), which sought to protect and preserve the Columbia River Gorge against unrestricted industrial devel-

---

**1.** A preliminary permit does not authorize project construction but rather allows the holder to gather the data necessary for a license application. 16 U.S.C. § 797(f) (1988).

opment.[2] It was this Act, or more specifically, the Final Interim Guidelines issued under its authority, which caused the Forest Service—the administering agency—to write plaintiff on November 23, 1987, to advise that production of hydroelectric power for commercial purposes in the National Scenic Area represented an "industrial land use" within the meaning of the Final Interim Guidelines.[3] "Therefore," the letter stated, "the Broughton hydro-electric project would be an inconsistent land use in the Columbia River Gorge National Scenic Area."

On the basis of this communication from the Forest Service, plaintiff took no further action in pursuit of a FERC license; the preliminary permit lay idle. Two years later, on November 2, 1989, plaintiff informed FERC that it was surrendering its preliminary permit on the ground that the "this project . . . is prohibited by current law and thus the feasibility studies under the existing permit are futile." Plaintiff's letter to FERC went on to declare that it would pursue litigation against the United States to redress "an unconstitutional taking of a valuable property right as a result of the Columbia Gorge legislation and its implementing regulations."

### Discussion

Plaintiff contends that, at the time the Gorge Act became law, it possessed a reasonable investment-backed expectancy in the use of its water right for the purpose of hydroelectric power generation. The passage of the Gorge Act, plaintiff argues, deprived it of this expectancy and made further efforts to acquire the necessary permits and approvals futile. Thus, plaintiff seeks compensation for its loss.

Plaintiff's argument rests upon the premise that but for passage of the Gorge Act, Broughton would have been able to use its water right for hydroelectric generation. This is a large assumption—one that we cannot endorse. We explain below.

### The FERC License Application Process

As has been noted, plaintiff's attempt to obtain FERC approval began and ended at a very early stage of the process—the preliminary permit stage. Thus, one can only speculate as to what would have occurred if, in the absence of the Gorge Act, plaintiff had continued its pursuit of a FERC license. In this connection, we would note at the start that very few of those who enter into the FERC licensing process emerge from the other end with a license to build. At a 1991 congressional hearing, a FERC official testified that "the great majority of project proposals do not ripen into license applications. Of the approximately 150 preliminary permits issued each year to study hydropower development, only about 15 percent—some 23 permits—become license applications." *National Energy Strategy: Hearings on Hydropower and Oil Production Regulation Before the Subcomm. on Energy and Power of the House Comm. on Energy and Commerce,* 102d Cong., 1st Sess. 512 (1991) [hereinafter *Hearings* ] (statement of Cynthia A. Marlette, Associate General Counsel, FERC).

Moreover, for the small number of projects that do advance to the license application stage, FERC may not issue a license without weighing "the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat),

---

**2.** The twin purposes of the Gorge Act are:

   (1) to establish a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge; and
   (2) to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in the existing urban areas and by allowing future economic development in a manner that is consistent with paragraph (1).

16 U.S.C. § 544a (1988).

**3.** The Gorge Act authorizes the Secretary of Agriculture to develop Interim Guidelines to "identify land use activities which are inconsistent with" the Act. 16 U.S.C. § 544h (1988). The Guidelines include the statement that "[n]ew industrial development outside the Urban Areas is inconsistent with the Act." The Definitions section includes "[p]roduction of hydro-electric power for commercial purposes" as an "industrial facility or land use." Final Interim Guidelines, Columbia River Gorge National Scenic Area, June 30, 1987, at 8, 10 (*see* Notice of Availability, 52 Fed.Reg. 25618–02 (1987)).

the protection of recreational opportunities, and the preservation of other aspects of environmental quality." 16 U.S.C. § 797(e) (1988). In recent years, only 7% of applications have led to actual construction. *See Hearings* at 556 (statement of Wayne L. Rogers, National Hydropower Ass'n) (citing FERC statistics for the period 1980–1990).

It is also important to note here that, even though plaintiff's plans never proceeded beyond the preliminary permit stage, serious concerns were voiced as soon as those plans became known. In 1986, FERC had issued a public notice acknowledging receipt of Broughton's preliminary permit application. This notice caught the attention of those interested in the welfare of fish populations and the protection of fish hatcheries located on the river. The Washington Department of Fisheries, the Washington Department of Game, and a conservation group called the Friends of the Columbia Gorge each filed a motion to intervene in the FERC process.

In addition, the regional office of the Department of Interior sent a letter to FERC detailing Fish and Wildlife Service concerns. Subsequently, in a letter dated September 29, 1987, the Fish and Wildlife Service cautioned plaintiff that it might well oppose the project because of "the likelihood of the subject project's causing significant adverse impacts to operations of Willard National Fish Hatchery, Little White Salmon Fish Hatchery, Little White Salmon Fish Nutrition Laboratory, and the ecosystem of the Little White Salmon River." The letter went on to say that, due to these concerns, "it should be understood that the Fish and Wildlife Service may ultimately recommend that the project not be built."

### Preexisting State Regulation

FERC licensing concerns were not, however, plaintiff's only potential problems. Had plaintiff pursued its goal of hydroelectric development further, it would have had to clear the numerous state regulatory hurdles that stood between the proposal and its realization. A March 17, 1988 letter to plaintiff from the Washington Department of Ecology lists 25 permits or approvals which may be required for the development of a given hydroelectric project. These include State Environmental Policy Act compliance; water quality certification under § 401 of the federal Clean Water Act; discharge permits; and permits for activities such as burning, dumping, road use, and the like.

While not all of the state-required approvals applicable to plaintiff's proposal would have created significant obstacles, some might have acted as a real barrier. For example, one requirement mentioned in the March 17th letter is hydraulic project approval. This approval must be obtained from the Department of Fisheries—one of the state agencies that had filed a motion to intervene in plaintiff's FERC proceeding—and the Department of Wildlife. The approval would be based in part on "studies of potential impacts to anadromous fisheries" conducted pursuant to Department of Fisheries guidelines.

In addition to satisfying the various requirements listed in the Department of Ecology letter, plaintiff would also have had to apply for a change in use of its water right. "Generally, an appropriator is not limited to the use for which the appropriation was initially made." *Department of Ecology v. Abbott,* 103 Wash.2d 686, 694 P.2d 1071, 1077 (1985). Nevertheless, in the state of Washington a water use may be changed only "if such change can be made without detriment or injury to existing rights." Wash.Rev. Code § 90.03.380 (1992).

Plaintiff attempts to demonstrate that the change in use would have been beneficial, rather than injurious, to other users. Thus, plaintiff notes that when the flume was in operation, the water was not returned to the Little White Salmon River, but rather was delivered into the Columbia River (of which the Little White Salmon is a tributary). Because the water from the hydroelectric project would be returned to the Little White Salmon River at a point upstream from the fish hatcheries, plaintiff concludes that the hatcheries would benefit from the project.

We do not agree that the question of injury to other users can be so readily dismissed. Among the existing water rights holders on the Little White Salmon River is the U.S. Fish and Wildlife Service. This agency, as

noted above, had informed plaintiff that "the likelihood of the subject project's causing significant adverse impacts" to fish hatcheries might lead it to "ultimately recommend that the project not be built." Clearly, the Fish and Wildlife Service did not regard the project as beneficial to its operations.[4] We cannot assume that the state's decision, had plaintiff actually applied for a change in use, would have been in plaintiff's favor.

### Compensation for an Expectancy

■ One who claims a taking of an expectancy rooted in a property right must show that the expectancy is reasonable in order to receive compensation. The expectancy must be fortified by law; that is, only those expectancies "which have the law back of them" are property. *United States v. Willow River Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 763, 89 L.Ed. 1101 (1945). The relevant inquiry, therefore, is whether, absent passage of the Gorge Act, existing rules and regulations would favor approval of the hydroelectric project. The answer is that they would not. Based on the concerns surveyed above, one would have to conclude that, had plaintiff proceeded with its license application, it could not have expected clear sailing. Not only would it have been faced with the task of acquiring numerous state agency approvals—a task made more formidable by expressed opposition to the project—but it would also have had to survive a federal licensing process in which the vast majority of applicants fail.

Plaintiff says that, in deciding this case, we must give particular heed to the affidavit of Broughton's consultant, a hydroelectric project engineer. In this affidavit, the engineer expressed his opinion that, in light of Broughton's existing water-use rights and the modest construction and design issues

associated with the proposed hydroelectric project, regulatory approval from FERC and the other agencies "was highly probable." We do not think this affidavit adds to plaintiff's case. Predictions about the likely course of regulatory action, when offered without any basis in hard facts—for example, statistical data confirming favorable approval rates—are simply guesses without probative significance. Assessed in view of the facts presently before the court, the affidavits fall far short of demonstrating that plaintiff possessed a compensable expectancy.[5]

Considered in light of those facts, plaintiff's desire to develop its water right into a profitable enterprise through a change in use is not based on a reasonable expectancy. Thus, it does not rise to the level of a compensable property interest. "[A] mere unilateral expectation or an abstract need is not a property interest entitled to protection." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980). Because plaintiff had no compensable expectancy in its water right, the passage of the Gorge Act did not effect a taking of that right.

### Conclusion

Defendant's motion for summary judgment is granted and plaintiff's cross-motion for partial summary judgment is denied. Accordingly, the Clerk shall enter judgment dismissing the complaint.

---

4. The quantity of water flowing in a given stretch of river at a particular time is only one of numerous factors that may be affected by development. In its letter of December 9, 1986, to FERC, the Department of Interior (Pacific Northwest Region) listed other potential grounds for concern, including disruption to hatchery operations from construction and maintenance activities; erosion hazards; and adverse impact on water quality.

5. At the oral argument of the case, plaintiff for the first time raised the contention that the dis-

position of the case would require trial, *i.e.*, the receipt of future testimony in regard to the expectable outcome of the federal and state regulatory process. The contention points out the analytical defect in plaintiff's case. A compensable interest in property based on an expected future use must be grounded on much larger certainties than opinion testimony about the likelihood of gaining future regulatory approval. An interest in property so conjectural is too insubstantial to be regarded as a compensable interest.