1997 SD 114

SDDS, INC., a South Dakota corporation, Plaintiff and Appellant,

v.

STATE of South Dakota, William J. Janklow, as Governor, Joyce Hazeltine, as Secretary of State, and Mark Barnett, as Attorney General for the State of South Dakota, Defendants and Appellees.

No. 19555.

Supreme Court of South Dakota.

Considered on Briefs June 4, 1997.

Decided Sept. 17, 1997.

Rehearing Denied Oct. 24, 1997.

Kimberly A. Mortenson, Ft. Pierre, Edward T. Lyons, Jr., David E. Driggers, Thomas J. Burke, Jr. of Jones & Keller, P.C., Denver, CO, for plaintiff and appellant.

Mark W. Barnett, Attorney General, Diane Best, Roxanne Giedd, Asst. Attys. General, Pierre, for defendants and appellees.

KONENKAMP, Justice.

[¶ 1.] In 1988, South Dakota Disposal Systems (SDDS) began the process of founding the Lonetree municipal solid waste landfill in southwestern South Dakota. The plan met with many roadblocks, including citizen resistance, administrative and legislative activity, and court challenges. In 1992, a statewide referendum rejected prior legislative approval for the facility, and SDDS brought a takings action against the State for alleged losses resulting from the adverse vote. The circuit court granted summary judgment for the State, and SDDS appealed to this Court. While this appeal was pending, the Eighth Circuit Court of Appeals issued an injunction barring the State from relitigating key issues in the state court forum. Does this claim preclusion and liability determination mandate we reverse the summary judgment? As we are bound by its ruling, we answer yes, and remand the action to the circuit court consistent with the Eighth Circuit's decision.

### Facts

[¶ 2.] Nearly a decade ago, SDDS purchased 1200 acres of rangeland near Edgemont in Fall River County. It was interested in locating and operating a balefill facility (Lonetree) that would receive initially 300,000 and later over 7.75 million tons of municipal solid waste (MSW). On November 17, 1988, SDDS filed an application with the Department of Water and Natural Resources (Department) [1] for a one-year permit, pursuant to SDCL ch 34A–6, to site, construct, and operate the MSW disposal facility. On July 10, 1989, the Department published notices in four South Dakota newspapers that it intended to deny a one-year permit and listed six deficiencies in the SDDS application. The recommendation included a notice that aggrieved persons could petition the Board of Minerals and Environment (BME), a division of the Department, for a hearing within thirty days. SDDS filed a petition, and Technical Information Project (TIP), a public interest group, was allowed to intervene in the proceedings. Before the hearing, SDDS sought to cure the six deficiencies in the application by corresponding with the Department; this correspondence was made part of the public file.

[¶ 3.] Following an evidentiary hearing, the BME issued SDDS a one-year permit (Original Permit) on September 7, 1989, under SDCL 34A–6–1.16.[2] TIP appealed to the circuit court, which affirmed the BME's decision, despite purported errors regarding issuance of an Environmental Impact Statement, ex parte communications about the permit, and alleged deficient findings by the BME. A subsequent appeal was brought to this Court. *In re Application of SDDS, Inc. for a Solid Waste Permit*, 472 N.W.2d 502 (SD 1991)(*SDDS I* ). On June 26, 1991, we reversed and remanded the decision to the BME for more specific findings to support the Original Permit regarding the public interest in and the environmental safety of the Lonetree dump.[3] *SDDS I*, 472 N.W.2d at

---

1. The Department of Water and Natural Resources is now known as the Department of Environment and Natural Resources.

2. Between the application and issuance of the permit, the Department failed to act on the application within the requisite 120–day period. SDDS sued, and the Sixth Judicial Circuit directed the Department to act.

3. To permit a waste facility to be located, the BME must find that it is in the public interest. SDCL 34A–6–1.13. This requires revelation of the facts underlying such a decision by the BME. *Lemke v. Rabenberg's, Inc.*, 89 S.D. 386, 233 N.W.2d 336 (1975). However, the BME made only conclusory findings regarding SDDS. Further, the BME's findings about the environmental safety of the facility were similarly lacking in explicit factual basis, making review difficult un-

513–14. Without such findings, the permit was void. *Id.*

[¶ 4.] While *SDDS I* was winding through the judicial system, a series of other events transpired. In March of 1990, SDDS petitioned the Department and Board for a five-year Renewal Permit to allow it to dispose of 7.75 million tons of MSW, 90% of which would be imported from other states. During this time, Action for the Environment (ACT),[4] the public interest arm of TIP, was collecting petitions to put an Initiative on the November 6, 1990 general ballot. The Initiative required legislative approval for solid waste facilities with yearly capacities over 200,000 tons. This Initiative passed on election day, to take effect on November 22, 1990.[5] On November 7, 1990, SDDS laid off workers and ceased site preparations. It alleged that up to that time, it had expended over five million dollars in pursuit of the facility.[6]

[¶ 5.] At this point, the Department had yet to act on the Renewal Permit. On December 7, 1990, however, the Department granted the five-year Renewal Permit to SDDS, following another contested hearing. In January of 1991, SDDS filed suit in the Sixth Judicial Circuit, alleging $100 million in damages for inverse condemnation caused by the Initiative. SDDS voluntarily dismissed the action in the fall of 1991. Also in January 1991, a bill was introduced in the South Dakota Legislature to provide SDDS with the authorization needed to site and operate Lonetree. The bill, Senate Bill 169 (SB 169), passed both houses and was signed by Governor Mickelson in February, to take effect on July 1, 1991. In May, a Referendum petition was filed with the Secretary of State's office, referring SB 169, seeking to overturn the legislative authorization for Lonetree, and to put the matter to a vote in November 1992. However, in June 1991, *SDDS I* was issued, reversing the right to develop and site the facility under the one year permit. *SDDS I*, 472 N.W.2d at 514.

[¶ 6.] In September 1991, the BME held a rehearing on the Original Permit, pursuant to direction from *SDDS I*. It made additional findings of fact regarding the public interest and environmental safety issues, based on the 1989 record. It issued no orders and no new permit, nor did it reissue the Original Permit. Then, in February 1992, we decided *SDDS, Inc. v. State of South Dakota*, 481 N.W.2d 270 (SD 1992)(*SDDS II*). In that case, we held that SDDS was not authorized to start operations until after the 1992 Referendum vote. In the meantime, the Seventh Judicial Circuit was considering an appeal from the BME's findings, and, in the spring of 1992, that court concluded we had reversed issuance of the Original Permit by virtue of *SDDS II*. So, the case was remanded to the BME. On April 16, 1992, the BME declined to reissue the Original Permit, despite the circuit court's remand, because it wanted to wait until this Court decided the matter.

---

der the Administrative Procedures Act, SDCL 1–26–25.

4. ACT was formerly known as the Surface Mining Initiative Fund (SMIF).

5. The tenets of the initiative were codified at SDCL 34A–6–53 et seq.:

**SDCL 34A–6–53. Legislative approval required for large-scale solid waste facilities—Requirements.** No large-scale solid waste facility may be sited, constructed or operated in this state unless the Legislature enacts a bill approving the siting, construction or operation of such facility pursuant to a solid waste permit or permit renewals, issued by the board of minerals and environment. The Legislature must find that the facility is environmentally safe and in the public interest.

**SDCL 34A–6–54. Definition of large-scale solid waste facility.** A large-scale solid waste facility

is any single facility, or two or more facilities operated as a single unit, in which over two hundred thousand tons of solid waste is disposed or incinerated per year.

**SDCL 34A–6–55. Existing facilities to cease until legislative approval is obtained.** The board of minerals and environment shall cause any existing large-scale solid waste facility to cease operation unless or until legislative approval as prescribed in § 34A–6–53 has been obtained.

**SDCL 34A–6–56. Approval requirements are retroactive.** The provisions of §§ 34A–6–53 to 34A–6–56, inclusive, are retroactive to July 1, 1989.

6. There is some dispute over whether it was appropriate for the circuit court, in the case we now consider, to characterize SDDS' claim for damages at $5.6 million or at $100 million.

[¶ 7.] During this time, a constitutional challenge to the Initiative was pending in the Sixth Judicial Circuit. On October 31, 1991, the circuit court upheld the constitutionality of the Initiative in all material respects.[7] No appeal followed. The next month, SDDS filed a second takings-inverse condemnation action, having voluntarily dismissed the takings case pending in Hughes County. This time, suit was filed in Fall River County (Seventh Judicial Circuit) claiming $100 million in damages arising from both the Initiative and Referendum. The State appealed the venue of this action, and we ruled in June 1993 that Hughes County, not Fall River County, was the appropriate venue. *SDDS, Inc. v. State of South Dakota*, 502 N.W.2d 852 (SD 1993)(*SDDS III* ).

[¶ 8.] Still in question at this point was the validity of the Original Permit and the later Renewal Permit. In July 1992, the Seventh Judicial Circuit held that the Original Permit had been revoked by our actions in *SDDS I*. This was appealed, and we upheld the decision in *Matter of 1990 Renewal Application of SDDS*, 507 N.W.2d 702 (SD 1993)(*SDDS IV* ). We noted that no permit existed after we remanded it to the BME for more findings in *SDDS I*. "One thing is absolute: Without proof of public interest, no permit could have been properly issued." *Id.* at 703. "We have yet to see such a finding [of public interest] ... therefore, the permit cannot be said to have ever been valid." *Id.*

[¶ 9.] While public and legal maneuvering continued in state venues, SDDS took another route, challenging the Initiative and Referendum in federal court. *See SDDS, Inc. v. State of South Dakota*, 994 F.2d 486 (8thCir.1993)(*Lonetree I* )(holding the Sixth Judicial Circuit's October 31, 1991 decision did not bar by virtue of *res judicata* and collateral estoppel federal constitutional appeal of Referendum); *SDDS, Inc. v. State of South Dakota*, 843 F.Supp. 546 (D.S.D.1994)(*Lonetree II* )(holding Referendum did not violate due process rights, equal protection rights, or the dormant commerce clause); *SDDS, Inc. v. State of South Dako-*

ta, 47 F.3d 263 (8thCir.1995)(*Lonetree III* )(reversing *Lonetree II* and holding Referendum violated the dormant commerce clause; declining to rule on due process and equal protection claims). The Eighth Circuit Court of Appeals, in *Lonetree III*, found that the Referendum was improper state protectionism, violating the dormant aspects of the Commerce Clause of the United States Constitution, Art. 1 § 8, Clause 3.

[¶ 10.] Finally, the present action came to the fore. After *SDDS III*, this second takings case was transferred to Hughes County, Sixth Judicial Circuit. SDDS seeks damages for an unconstitutional taking under the Fifth and Fourteenth Amendments to the United States Constitution and Article VI, Section 13 of the South Dakota Constitution. The complaint now alleges that the damages occurred only from the Referendum, not the Initiative. The period affected by the taking spanned the time between July 1, 1991, the date legislative approval of Lonetree would have taken effect absent the Referendum, and February 6, 1995, the date the Eighth Circuit Court of Appeals ruled in *Lonetree III* that the Referendum was unconstitutional.

[¶ 11.] Both parties moved for summary judgment, and on January 18, 1996, the Sixth Judicial Circuit granted the State's motion. SDDS appeals, offering four issues for our consideration: (1) Did the trial court follow required summary judgment standards in granting the State's motion? (2) Did SDDS have a constitutionally protected property interest or use interest to develop and operate Lonetree that was taken by the Referendum? (3) Did the Referendum effect a regulatory taking of property entitling SDDS to just compensation? (4) Was the Referendum the proximate cause of the taking damages alleged by SDDS?

### Analysis and Decision

■ [¶ 12.] The Eighth Circuit Court of Appeals recently issued *In re SDDS, Inc.*, 97 F.3d 1030 (8thCir.1996)(*Lonetree IV* ), which

---

7. Circuit Judge Zinter found that the Initiative did not violate the equal protection clause or the dormant commerce clause. He also found that no due process rights were violated concerning the Renewal Permit, as SDDS had no property right in it. On the Original Permit, he found due process rights were violated insofar as the Initiative's retroactive application affected SDDS.

bars the State from arguing SDDS had no legitimate entitlement to a permit. Defendants can no longer argue SDDS had no property right that could be threatened by an unconstitutional taking. Construing its holding in *Lonetree III*, the Eighth Circuit noted that "all of the factual predicates and legal requirements for SDDS' permit had been met [and] was necessarily dispositive of SDDS' property interest in the permit itself." *Lonetree IV*, 97 F.3d at 1039. Further, the court held that the State was barred from disputing "whether the referendum was the proximate cause of SDDS' dissolution. . . ." *Id.* at 1040.

[¶ 13.] This holding pointedly curtails our examination of the subject. Federal court power to enjoin a party from relitigating an issue in state court previously decided in a federal forum is clear. It stems from the Anti–Injunction Act, 28 USC § 2283,[8] which reinforces the federal interest in assuring appropriate supremacy under the Constitution. *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8thCir.1995); *Daewoo Electronics v. Western Auto Supply Co.*, 975 F.2d 474, 477 (8thCir.1992). The Eighth Circuit's decision is authorized from one of the two exceptions to the Act—the "relitigation exception." *McFarland v. Scott*, 512 U.S. 849, 857, 114 S.Ct. 2568, 2573, 129 L.Ed.2d 666, 675 (1994); *Daewoo*, 975 F.2d at 477. *See Ex parte Young*, 209 U.S. 123, 159, 28 S.Ct. 441, 453, 52 L.Ed. 714, 729 (1908)(empowering federal courts to enjoin a state from unconstitutional conduct). "The relitigation exception was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of *res judicata* and collateral estoppel." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147, 108 S.Ct. 1684, 1690, 100 L.Ed.2d 127, 136 (1988).

[¶ 14.] The Eighth Circuit decided in *Lonetree IV* that its holding in *Lonetree III*, while specifically dispositive of the dormant commerce clause issue, also rejected the State's arguments that SDDS held no property interest in the MSW facility and that the Referendum had no effect on its operation of it. 97 F.3d at 1038. Therefore, South Dakota "had one full and fair opportunity to litigate these issues in the federal forum, and the rules of equity do not require that they be given a second bite at the apple in the state forum in order to obtain a more favorable result." *Id.* at 1041.

[¶ 15.] As such, we are bound by the dictates of *Lonetree IV*, both by reason of the exception to the Anti–Injunction Act, as well as by principles of comity, *res judicata*, and collateral estoppel.[9] The following four tests must be met to sustain collateral estoppel:

---

**8.** The relevant language of the Act is as follows:
A court of the United States may not grant an injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. The Act itself is a "necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146, 108 S.Ct. 1684, 1689, 100 L.Ed.2d 127, 135 (1988).

**9.** Although we cannot reach the merits, our analysis of our own case law may have produced a different result. It is a clear principle of takings jurisprudence that, to be compensated, one must be deprived of a portion of the bundle of rights in the property that *existed when one obtained title to the property*. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798, 820 (1992). In determining what range of interests an owner can claim a right to, the Supreme Court has resorted to "existing rules or understandings that stem from an independent source such as state law." Id. at 1030, 112 S.Ct. at 2901, 120 L.Ed.2d at 822 (quotation omitted).

Two bodies of state law exist in South Dakota to provide such an "independent source." First, pervasive solid waste regulations precluded a vested property right in the bundle of rights. *Cecos International, Inc. v. Jorling*, 706 F.Supp. 1006, 1030 (N.D.N.Y.1989)(holding there was no property right in a solid waste permit until the administrative process was final). Extensive powers were then and continued to be granted to the Department to permit and oversee the construction and operation of solid waste disposal facilities. At the time, SDCL 34–16B et seq. (1967 & 1976 Supp) controlled a vast legislative authorization for the Department to undertake such activities. Such authority, both in statutes and administrative rules, has continued throughout the existence of SDDS. Simply buying the land gave SDDS no right to site Lonetree. It had to successfully complete our permitting process. *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed.Cir.1993), cert. denied, 511 U.S. 1106,

(1) The issue decided in the prior adjudication was identical with the one presented in the action in question;

(2) There was a final judgment on the merits;

(3) The party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and

(4) The party against whom the plea is asserted had a full and fair opportunity to litigate the issue in the prior adjudication.

*Grand State Property, Inc. v. Woods, Fuller, et al.*, 1996 SD 139, ¶ 12, 556 N.W.2d 84, 87 (quoting *Black Hills Novelty Co., Inc. v. South Dakota Commission on Gaming*, 520

114 S.Ct. 2100, 128 L.Ed.2d 662 (1994)(industries with extensive government regulation may not have the "right to exclude" the government from their dealings); cf. *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 393, 62 L.Ed.2d 332, 346 (1979)("right to exclude" fundamental element of property right falls within category of interests government cannot take without compensation).

SDDS never finally and successfully completed the permitting process required by our comprehensive regulations. We held that the Original Permit was void, absent valid findings by the BME. See *SDDS II*, 481 N.W.2d at 273 (Amundson, J., concurring in result)(noting, as author of SDDS I, that "the failure of an administrative agency to make express findings of fact where such findings are required, renders the administrative determination void."). The Original Permit was granted by the BME in September, 1989. It immediately, however, was subject to judicial review under SDCL 1–26–30, 1–26–30.2, and 1–26–37. Such review, when triggered, calls into question the continued validity of the permit. Any right to operate under SDCL 1–26–28, pending full appellate review, was no more final than the Original Permit was at that time. See *In re Silver King Mines*, 315 N.W.2d 689 (S.D.1982). For the Original Permit to have been valid from the beginning, it must have been supported by a finding by the BME of public interest, SDCL 34A–6–1.13, and of environmental safety, ARSD Art 74:27. It was not supported by sufficient findings of either; therefore, at that point already, the Original Permit was void. Because of this initial deficiency, we remanded the Original Permit to the BME to make further findings on both issues. *SDDS I*, 472 N.W.2d at 513. It is noteworthy that SDDS I was issued June 26, 1991, which was before July 1, 1991, the date on which legislative approval for Lonetree was to take effect and the date on which the taking allegedly began to occur.

Along with the failure of the regulation process, SDDS was prevented from asserting that it had, as a portion of its "bundle of rights" existing at the time of purchase, a right to operate the MSW facility because of South Dakota's unique voter involvement and the ever-present possibility of direct citizen intervention, through initiatives and referenda, in controversial topics affecting the welfare of the State. In addition to the various permitting hurdles and judicial review that needed to be undertaken, SDDS was very aware of the strong public opposition to the facility. While the existence of opposition to a matter need not necessarily trigger undue action, it is apparent that the campaign launched by ACT in the Legislature, over the airwaves, and in print media was not a case of simple opposition. In a state like South Dakota, an initiative or referendum on a hotly-contested issue is routine. In fact, it is notable that South Dakota was the first state to create direct, participatory power by its citizens. See *Christensen v. Carson*, 533 N.W.2d 712, 714 n* (SD 1995); *Wyatt v. Kundert*, 375 N.W.2d 186, 192–93 (S.D.1985); *Byre v. City of Chamberlain*, 362 N.W.2d 69 (S.D.1985)(generally, all legislative matters in which the people have an interest are subject to a referendum). In matters that spark statewide interest, South Dakotans truly rely on the maxim that "all power derives from the people" and often act accordingly. *Wyatt*, 375 N.W.2d at 193 (quoting *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 672–73, 96 S.Ct. 2358, 2361–62, 49 L.Ed.2d 132, 137 (1976)). Witness our State motto: "Under God the people rule." Therefore, like the purveyor of the water right in *Broughton Lumber Co. v. United States* who was affected by subsequent passage of a Congressional act, SDDS was affected by the referral of a legislative act. 30 Fed.Cl. 239 (1994). The analysis is similar:

> The relevant inquiry ... is whether, absent passage of the [new Congressional act], existing rules and regulations would favor approval of the hydroelectric project. The answer is that they would not.... [O]ne would have to conclude that, had plaintiff proceeded with its license application, it could not have expected clear sailing.

*Broughton Lumber*, 30 Fed.Cl. at 243. As the court held in that case, SDDS' "mere unilateral expectation or ... abstract need is not a property interest entitled to protection." Id. (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358, 364–65 (1980)).

Simple government encouragement to private parties to put capital into a risky business does not create a vested property right compensable under a takings scenario, especially in a state that has a vibrant history of direct citizen involvement and a formidable regulation scheme requiring strict compliance. *Allied–General Nuclear Services v. United States*, 839 F.2d 1572, 1578 (Fed.Cir.1988), cert. denied, 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988)(holding a property right was not created when state officials attempted to persuade Allied–General to build a nuclear power plant).

N.W.2d 70, 73 (S.D.1994)(other internal citations omitted)); *see Grand Laboratories, Inc. v. United States*, 882 F.Supp. 906, 909 (D.S.D.1995)(applying collateral estoppel under South Dakota law). Under this test, *Lonetree III* satisfies all the elements. The Eighth Circuit has held the issues of proximate cause and entitlement to a permit were conclusively determined in that case; the State is the same party against whom the prior adjudication was rendered; and the State had a full and fair opportunity to defend its claim at that point.[10]

■ [¶ 16.] Closely tied to the rule of collateral estoppel, and also binding on this Court in this instance, is the principle of *res judicata*. "The doctrine of *res judicata* serves as claim preclusion to prevent relitigation of an issue actually litigated or which could have been properly raised and determined in a prior action." *Hogg v. Siebrecht*, 464 N.W.2d 209, 211 (S.D.1990). The purpose behind the doctrine is to protect parties "from being subjected twice to the same cause of action, since public policy is best served when litigation has a finality." *Moe v. Moe*, 496 N.W.2d 593, 595 (S.D.1993). We apply the same principles of collateral estoppel to *res judicata*, so the analysis above is equally applicable in this instance. *Springer v. Black*, 520 N.W.2d 77, 79 (S.D.1994)(citing *Raschke v. DeGraff*, 81 S.D. 291, 295, 134 N.W.2d 294, 296 (1965)).

■ [¶ 17.] Finally, the doctrine of comity dictates that we accede to the decision of the Eighth Circuit in *Lonetree IV*. The following factors, needed for comity, are present here:

(1) The foreign court actually had jurisdiction over both the subject matter and the parties;

(2) The decree was not obtained fraudulently;

(3) The decree was rendered by a system of law reasonably assuring the requi-

sites of an impartial administration of justice—due notice and a hearing; and

(4) The judgment did not contravene the public policy of the jurisdiction in which it is relied upon.

*State v. Daly*, 454 N.W.2d 342, 344 (S.D.1990)(recognizing a federal court's determination based on comity). The federal courts certainly had jurisdiction over this federal constitutional matter, and there is no allegation the decree in *Lonetree IV* was obtained by fraud, by violating due notice and hearing requirements, or by contravening public policy.

[¶ 18.] Therefore, we are bound by the recent judgment of the Eighth Circuit. To rule in any other fashion would uselessly encourage "future state defendants ... to effectively ignore judgments rendered in the federal courts, generating needless relitigation in the state courts, and rendering our judgments largely nugatory and advisory." 97 F.3d at 1035–36 (discussing the Eleventh Amendment immunity asserted by the State). We are unwilling to beget such a result, and therefore remand the case to the circuit court for a jury's determination of what, if any, damages SDDS suffered at the hands of the State.

[¶ 19.] Reversed and remanded.

[¶ 20.] MILLER, C.J., and AMUNDSON and GILBERTSON, JJ., concur.

[¶ 21.] SABERS, J., concurs in result.

SABERS, Justice (concurring in result).

[¶ 22.] I agree with the analysis in footnote 9 and therefore concur in result.

---

10. The Eighth Circuit aptly invoked our previous holdings on these issues. *Lonetree IV*, 97 F.3d at 1039–40 (quoting the tenets of collateral estoppel from *Moe v. Moe*, 496 N.W.2d 593, 595 (S.D. 1993)).