_____

No. 96-2705
_____

In re: SDDS, Inc., a South          *
Dakota Corporation,                 *   Petition for Writ
                                    *   of Mandamus
          Petitioner.               *

_____

          Submitted:  August 26, 1996

              Filed:  October 3, 1996
_____

Before MAGILL, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

MAGILL, Circuit Judge.


     South Dakota Disposal Systems, Inc. (SDDS) moved the district court
to enjoin the State of South Dakota and various state officials in their
official capacities, including Mark W. Barnett, Attorney General of the
State of South Dakota, Walter D. Miller, Governor of the State of South
Dakota, and Joyce Hazeltine, Secretary of the State of South Dakota
(Defendants) from relitigating in the South Dakota state courts certain
issues previously decided by this Court.  The district court denied this
motion, and SDDS now petitions this Court for a writ of mandamus, directing
the district court to issue the injunction.  Defendants object, arguing
that this relief is improper under both the Eleventh Amendment and the
Anti-Injunction Act, 28 U.S.C. § 2283.  We disagree, and conclude that
injunctive relief is proper in the circumstances of this case.  Construing
SDDS's petition as an appeal of the district court's denial of injunctive
relief, we reverse.

On the last occasion during which these parties were before us, we stated that it was "the latest in a seemingly never-ending series of cases arising from SDDS's six-year-long struggle to develop a large-scale [multistate solid waste disposal, or MSWD] facility near Edgemont, South Dakota." SDDS, Inc. v. State of S.D., 47 F.3d 263, 265 (8th Cir. 1995) (SDDS VI). This description was unfortunately prescient; one-and-a-half years after penning those words, litigation continues in both state and federal courts concerning SDDS's efforts to construct and operate the MSWD facility. In this latest incarnation of the case, we are called upon to determine if the Defendants are attempting to relitigate issues decided previously by this Court and, if so, whether the Defendants should be enjoined from attempting such relitigation.

The facts of this case have been stated and restated by a variety of courts; see SDDS VI, 47 F.3d at 265-67; SDDS, Inc. v. State of S.D., 994 F.2d 486, 488-91 (8th Cir. 1993) (SDDS III); SDDS, Inc. v. State of S.D., 843 F. Supp. 546, 548-52 (D.S.D. 1994) (SDDS V), rev'd, SDDS VI, 47 F.3d at 265; Matter of 1990 Renewal Application of SDDS, 507 N.W.2d 702, 702-03 (S.D. 1993) (SDDS IV); SDDS, Inc. v. State, 481 N.W.2d 270, 271-72 (S.D. 1992) (SDDS II); Matter of SDDS, Inc., 472 N.W.2d 502, 504-06 (S.D. 1991) (SDDS I); SDDS, Inc. v. State of S.D., Civil Case No. 93-324 (S.D. 6th Jud. Cir. Ct. Jan. 17, 1996) (SDDS VII),[1] and only a brief summary need be provided here. SDDS purchased land in Fall River County, South Dakota, in 1988, with the intention of constructing the "Lonetree" facility, an MSWD site. In 1989, SDDS was successful in obtaining from the South Dakota Board of Minerals and Environment (Board) a one-year permit to site, construct, and operate the MSWD facility. In 1990, the Board granted SDDS a five-year renewal of its permit.

---

[1]This is, of course, not a complete list of prior judicial recitations of the facts of this case.

Both permits were challenged in South Dakota state courts.[2]  In SDDS I, the South Dakota Supreme Court ruled that the one-year permit was invalid because the Board had made insufficient findings of fact.  See id., 472 N.W.2d at 513.  In SDDS IV, the South Dakota Supreme Court held that, because the one-year permit had been declared invalid, the five-year renewal was void ab initio.  See id., 507 N.W.2d at 704.  In 1991, on remand after SDDS I, the Board made the required specified findings that the proposed MSWD facility was environmentally safe and was in the public interest.  See SDDS VI, 47 F.3d at 265 n.5 (detailing subsequent administrative history).[3]

During the course of the litigation over the Board's initial grant of permits to SDDS, the South Dakota electorate decided two ballot initiatives.  The first, Initiative Measure No. 1, was approved in 1990, and required legislative approval of large-scale solid waste disposal sites.  SDDS unsuccessfully challenged Initiative Measure No. 1 in the South Dakota trial court, see SDDS, Inc. v. State of S.D., Civil Case No. 90-412 (S.D. 6th Cir. Ct. Oct. 31, 1991), and did not appeal to the South Dakota Supreme Court.  The South Dakota legislature approved SDDS's MSWD site by

---

[2]Under South Dakota law, an aggrieved party may appeal an adverse administrative decision to the state courts.  See SDCL 1-26-30.  "'A final determination of an agency decision is reached when the reviewing court, after deciding the correctness of the matter on review, affirms the decision or remands it to the agency for reconsideration and a decision in accord with that court's directive.'"  Matter of Exploration Permit Renewal, Etc., 323 N.W.2d 858, 860 (S.D. 1982) (quoting Matter of Silver King Mines, Permit EX-5, 315 N.W.2d, 689, 693 (S.D. 1982) (Morgan, J., dissenting)).

[3]It does not appear that any South Dakota state court has addressed the merits of the Board's 1991 findings that the MSWD facility was environmentally safe and in the public interest. Rather, upon judicial review, the case was remanded to the Board "for the opportunity to reissue Original Permit" because the original permits had been invalidated.  See Br. in Support of Resp't's Answer at 4.  SDDS never received reissued permits.

-3-

passing 1991 Senate Bill 169. This bill was signed by the South Dakota governor, and was to take effect on July 1, 1991. See SDDS II, 481 N.W.2d at 272 (determining effective date of 1991 Senate Bill 169).

The other ballot initiative decided by the South Dakota electorate was a referendum on Senate Bill 169, requiring voter approval of SDDS's MSWD site. See SDDS VI, 47 F.3d at 266. The electorate vetoed the MSWD facility, which "shut down" SDDS's completion of the Lonetree site. See SDDS IV, 507 N.W.2d at 703.[4] SDDS challenged the referendum measure in federal court, arguing that it offended the dormant commerce clause. We reversed the district court's grant of summary judgment to the defendants twice, first holding that the unsuccessful challenge to Initiative Measure No. 1 in the South Dakota trial court did not act to collaterally estop the challenge to the referendum, see SDDS III, 994 F.2d at 494, and later holding that the referendum violated the dormant commerce clause. See SDDS VI, 47 F.3d at 272 (reversing SDDS V).

During the course of this wide ranging litigation, SDDS never opened its proposed MSWD site. In 1994, it sold the land planned for the development of the MSWD and went out of business. SDDS brought suit against the Defendants in South Dakota state court to recover an alleged $5.6 million dollar loss in development costs, arguing that the losses resulted from an uncompensated "taking" by the Defendants through operation of the unconstitutional referendum, in violation of the Fifth and Fourteenth Amendments. The South Dakota state trial court granted summary judgment to the Defendants, holding that SDDS had no property right in operating an

---

[4]At the time the referendum was decided by the South Dakota voters, SDDS was still operating under its five-year renewal permit. It was several years after the referendum placed "Senate Bill 169 in limbo," SDDS IV, 507 N.W.2d at 703, long after SDDS incurred its alleged injuries, that the South Dakota Supreme Court declared SDDS's five-year renewal permit "void ab initio." Id. at 704.

MSWD site, and that the referendum was not a proximate cause of SDDS's losses. See SDDS VII, Mem. Op. at 11, 18, 24-25. The appeal of SDDS VII is pending before the South Dakota Supreme Court.

Contending that the Defendants were attempting to relitigate issues decided by this Court in SDDS VI, SDDS sought an injunction in the federal district court against the Defendants. The district court summarily denied injunctive relief,[5] and SDDS now petitions this Court for a writ of mandamus. SDDS requests that we require the district court to issue an injunction against the Defendants, forbidding them from relitigating in the South Dakota state courts the issues of (1) whether SDDS had a legitimate claim of entitlement to a permit to operate an MSWD, and (2) whether the referendum was the proximate cause of SDDS's dissolution. The Defendants object to the issuance of the writ, arguing that the standards for a writ of mandamus have not been satisfied, that the Eleventh Amendment prohibits this suit, that the Anti-Injunction Act forbids issuance of the writ, and that injunctive relief is not warranted by the facts of the case. We address each of these arguments in turn.

---

[5]The district court stated:

On April 11, 1996, SDDS filed a motion for the issuance of an order to show cause, for a speedy hearing, and for a preliminary and a permanent injunction pursuant to the Declaratory Judgments Act and the All Writs Act. The state defendants responded on May 6, 1996. SDDS filed a reply on May 23, 1996. Essentially, SDDS's claim for injunctive relief seeks to have this Court enjoin a proceeding before the South Dakota Supreme Court. This Court declines to take such action. Accordingly, having considered the matter, it is hereby ORDERED that SDDS's motion for an order to show cause and for injunctive relief (Docket #133) is denied.

SDDS, Inc. v. State of S.D., Civil No. 91-5121 (D.S.D. May 28, 1996), reprinted in I Appellant's App. at Tab 12.

-5-

**II.**

The issuance of a writ of mandamus "is a drastic remedy to be invoked only in extraordinary situations," Melahn v. Pennock Ins., Inc., 965 F.2d 1497, 1501 (8th Cir. 1992) (quotations omitted), and may issue "only if a petitioner is able to establish a clear and indisputable right to the relief sought, the defendant has a nondiscretionary duty to honor that right, and the petitioner has no other adequate alternative administrative or judicial remedy." In re Lane, 801 F.2d 1040, 1042 (8th Cir. 1986) (quotations and citations omitted). The Defendants argue that a writ of mandamus is inappropriate to require a district court to issue an injunction, because such relief is left to the discretion of the district court. See id. ("Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is clear and indisputable." (quotations and citations omitted)).

We need not reach the question of whether a writ of mandamus may issue to correct a district court's abuse of discretion in denying injunctive relief. A denial of an injunction is an immediately appealable interlocutory order, see 28 U.S.C. § 1292(a)(1). Where the liberal standards for notice of appeal have been met in a case, a petition for a writ of mandamus may be construed as a notice of appeal from an immediately appealable order by a district court. See United States v. Gundersen, 978 F.2d 580, 583-84 (10th Cir. 1992) (construing petition for mandamus as notice of appeal, and citing cases); United States v. Green, 499 F.2d 538, 540 n.5 (D.C. Cir. 1974) (per curiam) (citing cases). Here, SDDS's petition for mandamus "was the functional equivalent of a notice of appeal [because] it fulfilled [Fed. R. App. P.] 3's requirements concerning notice," Gundersen, 978 F.2d at 583 (analyzing Smith v. Berry, 502 U.S. 544 (1992)). SDDS's petition specified the party taking the appeal, designated the district court order appealed from, and named the court to which the appeal

-6-

was taken.  See id.; see also Fed. R. App. P. 3(c).  In all of the circumstances of this case, therefore, we believe it is appropriate to construe SDDS's petition for a writ of mandamus as a notice of appeal.

## III.

The Eleventh Amendment generally bars suits brought against the states in federal courts.  While the specific language of the Eleventh Amendment refers only to "any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," U.S. Const. amend. XI,

> we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition which it confirms. That presupposition, first observed over a century ago in Hans v. Louisiana, 134 U.S. 1 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.

Seminole Tribe of Fla. v. Florida, 116 S. Ct. 1114, 1122 (1996) (citations and quotations omitted).  The immunity recognized by the Eleventh Amendment extends to both suits for monetary damages and those for declaratory or injunctive relief; "The Eleventh Amendment does not exist solely in order to prevent federal court judgments that must be paid out of a State's treasury; it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."  Id. at 1124.  South Dakota and its state officials sued in their official capacities would, therefore, normally be immune from suit in the federal courts.

In Ex parte Young, 209 U.S. 123 (1908), however, the Supreme Court established a fundamental exception to the Eleventh Amendment's immunity doctrine:

> Ex parte Young recognized that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law. The doctrine of Ex parte Young is based on the idea that the power of federal courts to enjoin continuing violations of federal law is necessary to vindicate the federal interest in assuring the supremacy of that law.

Fond Du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255 (8th Cir. 1995) (quotations and citations omitted). See also Denke v. South Dakota Dep't of Social Servs., 829 F.2d 688, 689 (8th Cir. 1987) ("Eleventh amendment analysis is an area dominated by formalistic rules, often neither intuitive nor strictly rational. However, over years of development, important exceptions to state immunity from suit have been recognized which allow citizens to vindicate rights infringed upon by state authorities. Extremely important in this regard is the substantial exception to the scope of the eleventh amendment represented by the case of Ex Parte Young, 209 U.S. 123 (1908)[,] and its progeny.").

Defendants did not contend that SDDS VI was improperly heard by this Court in violation of the Eleventh Amendment, and we do not believe that any such argument could have been successful. As a suit for prospective declaratory relief from South Dakota's ongoing violation of the dormant commerce clause, the Defendants could not have enjoyed immunity under the Eleventh Amendment in SDDS VI. See Ex parte Young, 209 U.S. at 159 ("the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity").

The question presented is therefore whether the Defendants,

who had been properly sued for declaratory relief in a prior suit, can now assert Eleventh Amendment immunity from this suit for prospective injunctive relief which seeks only to effectuate our earlier judgment. An affirmative answer would allow these Defendants, and all future state defendants, to effectively ignore judgments rendered in the federal courts, generating needless relitigation in the state courts, and rendering our judgments largely nugatory and advisory.[6] This is an intolerable result,

---

[6]Indeed, it is clear that this is precisely what the Defendants in this case have attempted to do to our judgment in SDDS VI almost from the moment the decision was filed. Upon our remand of the case to the district court for a determination of attorney's fees, the Defendants stated:

> All that has been obtained for the Plaintiff[ in SDDS VI], however, is a declaratory judgment that the referendum was unconstitutional. The court of appeals let stand this court's important rulings on the due process and equal protection issues raised by Plaintiffs.
>
> Plaintiff has, in essence, obtained a judgment which can do it no good. [FN2 In its response to Defendants' submission on the "prevailing party" issue, Plaintiff claims in a footnote that the ruling of the court of appeals may have some application in the state "inverse condemnation" case, but Plaintiff does not explain how the court of appeals ruling on the commerce clause issue can have any application to the inverse condemnation case. Additionally, it is important to note that the state courts could agree with this court[']s ruling (which the court of appeals let stand) that Plaintiff had no property interest which could be unlawfully taken.] Plaintiff has in fact accomplished nothing more than obtaining "the moral satisfaction of knowing that a federal court concluded [its] rights had been violated. . . . Farrar vs. Hobbey, [506 U.S. 103, 114] (1992), quoting Hewitt vs. Helms, 482 [U.S.] 755, 762 (1987). In these circumstances, a substantial reduction in the amount awarded, or [no] award at all, see Farrar, 506 U.S. at 115, is appropriate.

Resp. to Mot. to Determine Award of Att'ys' Fees & Costs & Req. for Hr'g at 13-14, reprinted in I Appellant's App. at Tab 7 (ellipses in original). Contrary to the Defendants' mischaracterizations of SDDS VI, we did not "let stand" any

-9-

and

_____

portion of the district court decision in SDDS V; rather, we
reversed the district court, and
remanded the case to the district court "with instructions to
enter judgment in favor of SDDS." SDDS VI, 47 F.3d at 272.

Similarly, in opposing SDDS's requested injunctive relief in
the district court, the Defendants urged the district court to
disregard our decision in SDDS VI by stating that:

> SDDS also argues that the Eighth Circuit decision is
> binding precedent on the state courts.  While the
> United States Supreme Court has the authority to enter
> decisions binding on the South Dakota Supreme Court,
> the lower federal courts do not have such power.

State Defs.' Br. In Supp. of Resistance to Pl.'s Mot. for Order
to Show Cause & for Speedy Hr'g & for Prelim. & Permanent Inj. at
14, reprinted in I Appellant's App. at Tab 10.  Contrary to the
Defendants' rather unique interpretation of federalism, the
judgments of this Court are, in fact, entitled to the same res
judicata and collateral estoppel effect in the South Dakota state
courts as judgments rendered by those courts. See, e.g., City of
Tacoma v. Tacoma Taxpayers, 357 U.S. 320, 334 (1958).

one which is not, we believe, mandated by the Eleventh Amendment.  We therefore hold that the Eleventh Amendment does not bar a suit in the federal court for injunctive relief to prohibit a state defendant from relitigating in a state court issues previously decided in a federal court.[7]

---

[7]The Defendants, citing Green v. Mansour, 474 U.S. 64 (1985), argue that the instant suit for injunctive relief is in fact a "demand that this Court direct the South Dakota courts to grant SDDS a monetary award to be paid from the South Dakota state treasury."  Br. In Supp. of Resp't's Answer at 13.  We disagree.  Green was an action for declaratory relief for an alleged past violation of constitutional rights; "the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed."  Green, 474 U.S. at 73.  By contrast, the suit before us has been brought to effectuate our judgment in SDDS VI, a "[r]emed[y] designed to end a continuing violation of federal law [which was] necessary to vindicate the federal interest in assuring the supremacy of that law."  Id. at 68.

## IV.

Embodying fundamental precepts of federalism and comity between federal and state courts, the Anti-Injunction Act provides that:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283.[8]  The Supreme Court has "expressly rejected the view that the anti-injunction statute merely states a flexible doctrine of comity, and [has] made clear that the statute imposes an absolute ban upon the issuance of a federal injunction against a pending state court proceeding, in the absence of one of the recognized exceptions . . . ." Mitchum v. Foster, 407 U.S. 225, 228-29 (1972) (citing Atlantic Coast Line R.R. v. Locomotive

---

[8]In Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146 (1988), the Supreme Court explained the purpose of the Anti-Injunction Act:

> The Act, which has existed in some form since 1793, see Act of Mar. 2, 1793, ch. 22, § 5, 1 Stat. 335, is a necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts.  It represents Congress' considered judgment as to how to balance the tensions inherent in such a system.  Prevention of frequent federal court intervention is important to make the dual system work effectively.  By generally barring such intervention, the Act forestalls the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court.  Due in no small part to the fundamental constitutional independence of the States, Congress adopted a general policy under which state proceedings should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately [the United States Supreme Court].

(quotations and citations omitted).

-12-

Eng'rs, 398 U.S. 281, 286-87 (1970) (note omitted)).

Included in the Anti-Injunction Act are specific, enumerated exceptions.  These exceptions, which "are designed to ensure the effectiveness and supremacy of federal law," Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146 (1988), include the relitigation exception.  This exception

> was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court.  It is founded in the well-recognized concepts of res judicata and collateral estoppel.

Id. at 147.  See also NBA v. Minnesota Pro. Basketball, Ltd. Partnership, 56 F.3d 866, 871 (8th Cir. 1995) ("The legislative policy that permits a federal court to enjoin state court action when a federal court has decided a suit on its substantive merits has equal force when a critical underlying issue unrelated to the substantive merits of the action has been litigated to finality." (quotations and citations omitted)).  As with all of the statutory exceptions, the relitigation exception is "narrow and [is] not to be enlarged by loose statutory construction."  Chick Kam Choo, 486 U.S. at 139 (quotations and citations omitted).

We review de novo the applicability of the relitigation exception. See NBA, 56 F.3d at 871.  In order to enjoin a state court from relitigating an issue, the issue must "actually have been decided by the federal court."  Chick Kam Choo, 486 U.S. at 148.  To determine if this strict and narrow prerequisite has been met, we must assess "the precise state of the record and what the earlier federal order actually said; [we may not] render a post hoc judgment as to what the order was intended to say."  Id. (citing Atlantic Coast, 398 U.S. at 290 (emphasis in original)).

In an extended discussion, the district court in SDDS V held

-13-

that SDDS had no protected property interest in operating an MSWD facility, and that the referendum had no effect on SDDS's ability to operate an MSWD. The district court stated:

> Under South Dakota law, SDDS needs two things in order to operate its Lonetree facility: (1) a valid permit and (2) legislative approval from the South Dakota Legislature. See SDCL 34A-6-1.4 to 34A-6-1.13 (solid waste disposal facilities must obtain permits); and SDCL 34A-6-53 to 34A-6-56 (solid waste disposal facilities handling in excess of 200,000 tons of waste annually must get legislative approval for their operations).

> At the time of the Referendum in November 1992, SDDS's one-year permit had expired. In any event, that one-year permit was void because the [Board], in issuing the permit, failed to make specific findings of fact that the Lonetree facility was in the public interest and that the facility met five specified environmental prerequisites.

> Although the [Board] had issued SDDS a five-year renewal permit and the Legislature had passed S.B. 169 approving the operation of the Lonetree facility, the five-year permit was invalid because it was based upon an invalid one-year permit. The five-year renewal permit was void ab initio. In other words, SDDS has never had a valid permit to operate the Lonetree facility. Without a valid permit, SDDS has no constitutionally protected property interest in operating the facility. Both of SDDS's due process claims fail.

> The Court notes that SDDS's remaining commerce clause and equal protection claims rest solely on the effect of the Referendum, the validity of the Initiated Measure having already been decided by [the South Dakota state court]. Furthermore, because SDDS has never had a valid permit to operate its Lonetree facility, S.B. 169 and the subsequent Referendum "vetoing" that bill have no practical effect. By the very unambiguous terms of the Initiated Measure, legislative approval may only be granted to a facility that is operational "pursuant to solid waste permit." SDCL 34A-6-53. SDDS has never had a valid permit. The legislature cannot have granted approval of the Lonetree facility if the facility had no permit to operate. It logically follows that if the legislature was not in a position to grant approval to the Lonetree facility, then the enabling legislation (S.B. 169) was of no effect. The Referendum would also be of no effect. If the Referendum had no effect, the

commerce clause and the equal protection clause are not implicated.

SDDS V, 843 F. Supp. at 553-54 (citations and notations omitted).

The Defendants, in their brief to this Court in SDDS VI, argued strenuously that we affirm these holdings. See Appellee's Br. in No. 94-1688, at 10-17, 41, reprinted in part in I Appellant's App. at Tab 2.[9] SDDS, of course, strongly urged that we reverse the district court on these points. See Appellant's Reply Br. in No. 94-1688, at 2-10, reprinted in I Appellant's App. at Tab 3.[10]

---

[9]For example, the Defendants previously argued that South Dakota's

> laws regulating solid waste facilities have changed
> since SDDS obtained its original 1989 permit. South
> Dakota's solid waste regulations were entirely
> rewritten in July of 1990, and have been amended once
> before the November 1992 Referendum and once after.
> Appellee's Appendix G. Since the September 1991
> findings issued by the Board were based on the original
> 1989 record, the September 1991 findings do not address
> or consider these regulatory changes. The Board must
> determine compliance with these new regulatory
> requirements before a solid waste permit can issue;
> this determination was never made and SDDS is therefore
> not entitled to a permit.

Appellee's Br. in No. 94-1688, at 14-15, reprinted in I Appellant's App. at Tab 2. See also id. at 41 ("More importantly the Referendum's disapproval of Senate Bill 169 did not impact SDDS's ability to accept out of state waste because SDDS could not accept any waste, regardless of the source, until it obtained new state solid waste permits." (emphasis in original)).

[10]For example, SDDS previously argued that

> the procedural defect in the [Board's] original
> decision --the lack of findings that resulted in the
> remand in SDDS I--had been cured by the time of the
> Referendum. . . . [O]n remand the [Board] entered
> extensive findings responsive to the [South Dakota]
> Supreme Court's mandate and concluded that SDDS had met
> "all requirements" for the issuance of a solid waste

In SDDS VI, we reversed the district court's judgment. See 47 F.3d at 272. In so doing, we explicitly accepted SDDS's arguments on both of these contested issues, and we explicitly rejected the Defendants' positions. Regarding the protected property interest in operating the MSWD, we stated:

> In 1991, S.D.Codified Laws § 34A-6-1.13 was amended and the implementing regulations were rewritten. Although the ultimate question of whether the facility was environmentally safe and in the public interest remained the same, several factors weighing into the agency's decision changed. On remand after SDDS I, the agency made the specific findings required by its revised regulations. The agency found the Lonetree facility to be environmentally safe, using language that parallels the applicable regulation. Appellant's App. at 117 (Finding # 52, parallelling S.D.Admin.R. 74:27:17:01). The agency found the facility to be in the public interest. Appellant's App. at 121 (Finding # 72). Both findings were preceded by numerous supporting factual findings. The revised [Board] findings also contain a specific legal conclusion that all requirements for the permit had been met. Appellant's App. at 122 (Conclusions of law # 3 & # 4).

SDDS VI, 47 F.3d at 265 n.5 (emphasis added).[11] This determination that all of the factual predicates and legal requirements for SDDS's permit had been met was necessarily dispositive of SDDS's property interest in the permit itself. See Littlefield v. City of Afton, 785 F.2d 596, 602 (8th Cir. 1986) ("We hold that appellants have a property interest in the building permit because they complied with all the legal requirements contained in the

---

permit under the relevant laws and regulations of South Dakota.

Appellant's Reply Br. in No. 94-1688, at 7, reprinted in Appellant's App. at Tab 3 (note omitted). See also id. at 3 ("[t]he State attempts to avoid the consequence of its admission concerning the Referendum's 'practical effect,' by engaging in an inventive but, unfortunately, distorted analysis of the state court litigation").

[11] We note that these factual determinations by an administrative agency must be given "great weight" by South Dakota courts. See SDCL 1-26-36.

-16-

ordinances of the City of Afton. Appellants need not comply with illegal conditions in order to have a property interest in the permit." (emphasis in original)), holding limited in part on other grounds, Lemke v. Cass County, Neb., 846 F.2d 469, 470-71 (8th Cir. 1987) (per curiam) (en banc) (holding that "[w]hether a substantive due process claim may arise from a denial of a zoning permit is an open question in this circuit and need not be decided in this case").[12]

Regarding the effect of the referendum on SDDS, we stated in SDDS VI that:

> Despite the fact that it has previously conceded that "[t]he practical effect of the referendum was to prohibit the construction" of the Lonetree facility, Appellant's App. at 39, South Dakota now argues that because the [Board] permit had been revoked, the referendum had no impact, discriminatory or otherwise, on Lonetree. However, if this court were to ignore South Dakota's intermediary actions and look only to the result, it would reward South Dakota for acting unconstitutionally. Moreover, the administrative permit was voided due to a procedural defect, not because of any finding that the Lonetree facility was environmentally dangerous. Thus, Lonetree could reapply for the administrative permit, and the referendum at the very least made the Lonetree

---

[12]In adopting the factual findings of the Board in SDDS VI, we did not then--and need not now--address the issue of whether those findings were entitled to claim preclusive effect. See Astoria Federal Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 109-10 (1991) ("Although administrative estoppel is favored as a matter of general policy, its suitability may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures."). Put bluntly, here we are not concerned with determining the accuracy of our decision in SDDS VI, but rather in insuring its effectiveness. See, e.g., Moe v. Moe, 496 N.W.2d 593, 595 (S.D. 1993) (res judicata applies "whether the court was correct at the time or not"). If the Defendants were dissatisfied with our adjudication of their case in SDDS VI, their options were to request rehearing by this Court en banc or to petition the United States Supreme Court for a writ of certiorari. They may not, however, collaterally challenge our decisions in the South Dakota state courts. See City of Tacoma, 357 U.S. at 334.

> project more difficult and expensive to accomplish.

Id. at 270 n.10 (citations and quotations omitted).[13]

The issues which the Defendants now wish to relitigate in the state courts were, therefore, actually and finally decided by this Court in SDDS VI. Under South Dakota's rules of claim preclusion or collateral estoppel, we conclude that this Court's decision in SDDS VI bars the Defendants from relitigating these settled issues in subsequent litigation in the state courts. See, e.g., Moe v. Moe, 496 N.W.2d 593, 595 (S.D. 1993):

> [I]f the prior final judgment or order had been rendered by a court of competent jurisdiction, it is conclusive as to all rights, questions, or facts directly involved and actually, or by necessary implication, determined therein, whether the court was correct at the time or not.
>
> We apply four factors to determine whether the doctrine of [claim preclusion] bars this appeal: (1) whether the issue decided in the former adjudication is identical with the present issue; (2) whether there was a final judgment on the merits; (3) whether the parties are identical; and (4) whether there was a full and fair opportunity to litigate the issues in the prior adjudication.

(citations and quotations omitted). See also Black Hills Novelty Co. v. South Dakota Comm'n, 520 N.W.2d 70, 73 (S.D. 1994) (describing elements of collateral estoppel). In this case, all of these elements have unquestionably been met: the issues are the same, the parties are the same, there was a final judgment on the

---

[13]Indeed, our ruling echoed that of the South Dakota Supreme Court in SDDS IV, 507 N.W.2d at 703, which found that the referendum "placed Senate Bill 169 in limbo and shut down the [Lonetree] facility pending the outcome of the general election." See also SDDS III, 994 F.2d at 489 ("S.B. 169 was, therefore, effectively vetoed by the citizens of South Dakota and the Lonetree project has been unable to proceed since.").

-18-

merits in SDDS VI, and the record amply reveals that the Defendants were not only given, but took every opportunity, to fully and fairly litigate these issues before us. Because the Defendants are barred by claim preclusion from relitigating the issues of (1) whether SDDS had a legitimate claim of entitlement to a permit to operate an MSWD, and (2) whether the referendum was the proximate cause of SDDS's dissolution, the relitigation exception to the Anti-Injunction Act permits injunctive relief to prevent them from so relitigating these issues in the South Dakota state courts.[14]

## V.

We recognize, however, that "[t]he fact that an injunction may issue under the Anti-Injunction Act does not mean that it must issue. The injunction must be an otherwise proper exercise of the [court's] equitable power." Daewoo Elecs. v. Western Auto Supply Co., 975 F.2d 474, 478 (8th Cir. 1992). We review the district court's denial of injunctive relief for abuse of discretion. See Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995). "Abuse of

---

[14]Under the Full Faith and Credit Act, 28 U.S.C. § 1738, we are bound by a state court's application of its res judicata rules to our judgments. See Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 524 (1986):

> We believe that the Anti-Injunction Act and the Full Faith and Credit Act can be construed consistently, simply by limiting the relitigation exception of the Anti-Injunction Act to those situations in which the state court has not yet ruled on the merits of the res judicata issue. Once the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act becomes applicable and federal courts must turn to state law to determine the preclusive effect of the state court's decision.

Because the South Dakota trial court did not rule on the claim preclusive effect of SDDS VI, see SDDS VII, Mem. Op. at 2 n.3, 5, 20-21, we are not precluded from protecting our judgment in SDDS VI under the relitigation exception to the Anti-Injunction Act. See Daewoo Elecs. v. Western Auto Supply Co., 975 F.2d 474, 479 (8th Cir. 1992).

-19-

discretion occurs if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions."  Hosna v. Groose, 80 F.3d 298, 303 (8th Cir. 1996) (quotations and citations omitted), pet. for cert. filed, No. 95-9498 (June 28, 1996).  See also Walser v. Toyota Motor Sales, U.S.A., Inc., 43 F.3d 396, 401 (8th Cir. 1994) ("We will not disturb a district court's discretionary decision if that decision remains within the range of choice available to the district court, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error of judgment." (quotations and citations omitted)).

In analyzing SDDS's motion for injunctive relief, the district court stated that:

> Essentially, SDDS's claim for injunctive relief seeks to have this Court enjoin a proceeding before the South Dakota Supreme Court.  This Court declines to take such action.

SDDS, Inc. v. State of S.D., Civil No. 91-5121 (D.S.D. May 28, 1996), reprinted in I Appellant's App. at Tab 12.  While this description overstates the degree of relief requested by SDDS--which sought to enjoin the relitigation of specific issues, rather than a blanket injunction of all consideration of its dispute with the Defendants by the South Dakota Supreme Court--it does represent a proper concern by the district court for a core element of federalism, embodied by the Anti-Injunction Act, that the federal courts should not interfere with the state courts' operation.  See, e.g., Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 91 (5th Cir. 1977) ("few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies" (analyzing abstention doctrine and Anti-Injunction Act) (quoting Railroad Comm'n v. Pullman Co., 312 U.S. 496, 500 (1941))), cert. denied, 434 U.S. 832 (1977); but see United States v. Rural Elec. Convenience Co-Op.

<u>Co.</u>, 922 F.2d 429, 439 (7th Cir. 1991) ("we do not believe that comity and federalism should be considered 'public interest' factors that militate against the issuance of an injunction").

The district court's analysis fails, however, to consider the factors which support the issuance of injunctive relief in this case. In <u>Dataphase Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109, 113 (8th Cir. 1981) (en banc), this Court held that:

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

Applying the <u>Dataphase</u> factors to the case before us, we conclude that the district court abused its discretion in denying injunctive relief. Requiring SDDS to relitigate in the state court issues previously decided by this Court constitutes an irreparable harm. <u>See, e.g.</u>, <u>Daewoo</u>, 975 F.2d at 478 (affirming district court's finding that petitioner "would suffer irreparable harm if injunctive relief were not issued because it would face relitigation of claims already adjudicated in its favor").[15]

While issuing the injunction in this case will foreclose the opportunity for the Defendants to relitigate issues in the state court, we do not believe that this is a legitimate harm which must

---

[15]A petitioner seeking to enjoin a criminal or quasi-criminal state court proceeding must demonstrate a threat of "great and immediate irreparable injury that cannot be eliminated by his defense to the state proceeding." <u>Goodrich v. Supreme Court of S.D.</u>, 511 F.2d 316, 317 (8th Cir. 1975) (refusing to enjoin state court disbarment proceeding (citing <u>Younger v. Harris</u>, 401 U.S. 37, 46 (1971))). Where a petitioner seeks to enjoin a state court's civil proceeding, however, we have only required a showing of "irreparable harm" to allow a grant of injunctive relief. <u>See Daewoo</u>, 975 F.2d at 478 (analyzing <u>Goodrich</u>).

be balanced. As noted above, the Defendants had one full and fair opportunity to litigate these issues in the federal forum, and the rules of equity do not require that they be given a second bite at the apple in the state forum in order to obtain a more favorable result. See, e.g., Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 299 (1917) ("This doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, of public policy and of private peace, which should be cordially regarded and enforced by the courts to the end that rights once established by the final judgment of a court of competent jurisdiction shall be recognized by those who are bound by it in every way, wherever the judgment is entitled to respect." (quotations and citation omitted)).

The third and fourth Dataphase elements also support issuance of an injunction in this case. As discussed above, SDDS successfully litigated in SDDS VI the issues currently contested by the Defendants; SDDS's success on the merits of the underlying issue is therefore already secured. In addition, the public policy concerns of finality and repose informing our res judicata jurisprudence strongly supports the protection of our previous judgment. While the interference with a state court proceeding is generally opposed by public policy, this "injunction will promote judicial economy and protection of parties from harassing, duplicative litigation, interests which the federal and state courts share." Daewoo, 975 F.2d at 479 (citation omitted).

We find no merit in the Defendants' remaining arguments opposing the granting of injunctive relief. We therefore reverse the district court's denial of injunctive relief in this case, and remand to the district court for an order enjoining the Defendants from relitigating in the South Dakota state courts the issues of (1) whether SDDS had a legitimate claim of entitlement to a permit to operate an MSWD, and (2) whether the referendum was the

-22-

proximate cause of SDDS's dissolution.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.